579 A.2d 970

COMMONWEALTH of Pennsylvania

v.

William A. LONG, Appellant.

Superior Court of Pennsylvania.

Submitted June 25, 1990.

Filed Aug. 20, 1990.

Stanton D. Levenson, Pittsburgh, for appellant.

James R. Gilmore, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before CIRILLO, President Judge, and POPOVICH and HESTER, JJ.

HESTER, Judge:

This is a direct appeal from the judgment of sentence of ten to twenty years imprisonment entered following appellant's conviction by a jury of murder of the third degree. We affirm.

Appellant, William Long, was convicted on May 3, 1989, for the shooting death of Jonathan Bailey on August 20, 1988. Following the denial of post-verdict motions, appellant was sentenced. This timely appeal followed.

Appellant presents one issue for our review:

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN REFUSING THE APPELLANT'S REQUEST THAT THE JURY BE CHARGED THAT IT COULD RETURN A VERDICT OF INVOLUNTARY MANSLAUGHTER WHERE THAT OFFENSE WAS MADE AN ISSUE IN THE CASE AND THE TRIAL EVIDENCE WOULD HAVE SUPPORTED SUCH A VERDICT?

The jury in the instant case did receive instructions on first degree murder, third degree murder, and voluntary manslaughter. Defense counsel requested a jury instruction on involuntary manslaughter which the trial court denied.

Since the Pennsylvania Supreme Court's decisions in *Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399 (1980),

and *Commonwealth v. Williams,* 490 Pa. 187, 415 A.2d 403 (1980), it has been settled that "in a murder prosecution, an involuntary manslaughter charge shall be given only when requested, and where the offense has been made an issue in the case and the trial evidence reasonably would support such a verdict." *Id.,* 490 Pa. at 185, 415 A.2d at 402; 490 Pa. at 190, 415 A.2d at 404.

Appellant contends that the evidence offered at trial would have supported a verdict for involuntary manslaughter. In support of this claim, he relies upon *Commonwealth v. Terrell,* 482 Pa. 303, 393 A.2d 1117 (1978), contending that the similar facts of *Terrell* compel the conclusion that the facts in this case rationally would sustain such a verdict. Appellant also asserts that the trial court in the instant case applied an improper standard when determining whether an involuntary manslaughter charge was warranted. He contends that the court failed to view the facts in a light most favorable to him and instead credited the Commonwealth's version of the facts. In support of this claim, appellant quotes the trial court's statement that appellant "ran for several hundred feet, took careful aim, and calmly delivered the fatal act of violence." Appellant's brief at 15, quoting trial court opinion at 18. Appellant asserts that such a statement ignores appellant's own testimony that he did not crouch down or drop down to fire the gun.

■ Even considering only appellant's evidence, however, it is clear that the facts presented did not warrant an involuntary manslaughter charge. Appellant's own summary of the facts, as stated in his brief, are as follows.

In the early morning hours of August 20, 1989, Appellant received a telephone call from his mother-in-law, Alberta Houston, informing him that his 20-year-old niece, Stephanie ... had been raped. After receiving this phone call, he woke up his daughter, told her that Stephanie had been raped, telephoned his wife Judy Long at the V.A. Hospital where she worked as a registered nurse, told her what happened, and then proceeded with his

daughter to his mother-in-law's house. Appellant arrived there at 9:30 a.m. to find his mother-in-law "hysterical".

Meanwhile, Judy Long had driven to Magee Women's Hospital to get Stephanie and take her to Judy's mother's house where Stephanie lived. When Judy met Stephanie at the hospital, Stephanie was crying and "devastated." Judy and Stephanie arrived at Stephanie's home at around 10:30 a.m. Stephanie was clothed in a bathrobe and still appeared "very hysterical." She immediately took a shower, and Judy returned to work.

About a half an hour later, Stephanie told Appellant that she had been raped. Appellant asked her if she knew who raped her. She said Jonathon Bailey from Homewood (whom Appellant had not known previously) and described the car he was driving. She also told Appellant that Bailey had threatened her that he didn't care who she had told because if she told anyone and they said anything to him he would f___ them up and he would f___ her up too, and that if she put him in jail, that he was going to kill her when he got out."

About half an hour later, Appellant went to a local bar on Lincoln Avenue, had a beer and then went to Homewood to get some information on Jonathon Bailey. Appellant visited the Homewood Field (also known as Willie Stargell Field) at around 3:00 p.m. Through his investigation, Appellant learned that Bailey would be at Homewood Field at approximately 6:00 p.m. to attend football practice for a semi-professional team called the East End Raiders. At around 4:00 p.m., Appellant picked up his wife at work and drove to his mother-in-law's house to get his mother-in-law and Stephanie so Stephanie could report the rape to the Monroeville police. After taking Appellant home at 5:00 p.m., Judy Long, her mother and Stephanie proceeded to the Monroeville police station where Stephanie made her report.

Meanwhile, at around 5:30 p.m., Appellant thought that, since Stephanie was pressing charges against Bailey, he should try to talk to him. Appellant then walked

to Homewood Field in search of Bailey. He had a gun for self-protection. When Appellant arrived at the field around 6:00 p.m., he shot basketball for a while and made some inquiries about Bailey. A short time later, Appellant saw his brothers, Dusty and Michael, at the field. Since Appellant had no idea that his brothers would be there, he asked them, "What are you guys doing here?". They said they had "run into a friend" of Appellant's who told them he would be at the Homewood Field. His brothers asked him what was going on, to which the Appellant replied, "I came up here to see this guy about Stephanie." Michael asked if he was all right, and Appellant said, "Yes, I'm all right, you guys don't have to stick around." They said they would wait around anyway.

Five minutes later, a man in a silver gray Chrysler pulled up and parked the car. When he got out, Appelled [sic] called, "Hey, Jonathon." Bailey turned around and replied, "What?" Appellant said, "I want to talk to you ... about Stephanie." Bailey responded, "Stephanie who?". Appellant said, "Stephanie ..., the girl you raped." Bailey retorted, "F___ you and Stephanie, I don't want to hear that sh___." At that point, Bailed [sic] walked across the street and started conversing with a Mr. Eackles. Appellant pursued Bailey to let him know that Stephanie had gone to the police to press charges against him and that if Bailey harmed her, he would have to answer to him. As Appellant approached Bailey and Eackles, Bailey got into Eackles' car with Mrs. Eackles. Appellant then told Bailey, "Now are you going to get out, man, are you going to get out of the mother f___ car and talk to me like a man, or do you just like to take pussy?" Angered by Appellant's words, Bailey kicked at Appellant and then grabbed a pipe and hit Appellant on the arm as Appellant reached for Bailey's legs. Appellant backed up several feet from the car and Bailey came out, exclaiming: "You want to see me, mother f___, you want to see me." Appellant pulled out the pistol and fired two shots into the ground in an attempt to stop

Bailey. Simultaneously, Dusty Long had come from across the street and hit Bailey in the back with a piece of wood as he grabbed Bailey by the shirt. Bailey then broke loose from Dusty, tearing his shirt, and started running away. Appellant chased him. Bailey ran over the wall and through the courtyard. Appellant yelled, "Stop, man, if this is what you want, stop, mother f___." As Bailey ran onto the field, Appellant fired his gun from about 124 feet away and hit Bailey in the back, causing him to fall to the ground. Appellant immediately ran up to Bailey. He felt scared for doing something he had not intended to do. Realizing that Bailey was hurt, Appellant turned and ran off the field. Appellant did not see what happened to Bailey after his departure.

Jonathon Bailey died, possibly more than an hour later, due to the combination of a single gunshot wound and blunt force trauma to the head.

Appellant's brief at 5–8 (citations to the record and footnotes omitted).

The trial court's statement in its opinion that appellant "took careful aim, and calmly delivered the fatal act of violence" is a reference to the testimony of four eyewitnesses to the shooting who testified that when appellant fired the fatal shot as he chased the victim across the football field, he knelt down, crouched down, or squatted down and aimed at the victim and shot him in the back. Even if we were to disregard the testimony that appellant crouched down when he fired, the evidence clearly does not support a jury charge or verdict as to involuntary manslaughter.

A person is guilty of involuntary manslaughter "when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner ... he causes the death of another person." 18 Pa.C.S. § 2504(a). The testimony at trial, instead, is sufficient to prove an intentional or unintentional malicious killing. Appellant's own testimony at trial established that he fired two shots into the ground as the victim attempted to exit the Eackles' vehicle in order "to stop him." Notes of Testimony (N.T.), 2/2/89, at 693. He

testified that he fired the third shot into the victim's back as the victim tried to run away. *Id.* at 694. Appellant never stated why he directed the third shot at the victim. He contended only that he shouted, "Stop, if this is what you want, stop, mother f___" *Id.* Appellant never stated that he fired the third shot in order to stop the victim. Even if appellant had made such a claim, however, it would not support his contention that involuntary manslaughter was at issue. It is ludicrous to suggest that appellant recklessly and negligently chased the victim onto a field and fired a shot into the fleeing victim's back from thirty yards away simply to stop him. *See also Commonwealth v. Williams, supra* (in light of the facts, it is ludicrous to suggest that the defendant recklessly or negligently struck twelve blows with an iron pipe to the blind victim's head).

Furthermore, appellant's reliance on *Commonwealth v. Terrell, supra,* is misplaced. We note initially that the opinion in *Terrell,* authored by Justice Pomeroy, was joined only by Chief Justice Eagen. Four other justices concurred with three concurring opinions. Further, the *Terrell* decision predated *White* and *Williams* by two years. More importantly, however, the facts in *Terrell* are significantly different from the instant facts. In *Terrell,* the defendant and his friend, Richard Alexander, were playing cards when the defendant accused Alexander of cheating. Alexander took the money on the table and left. Later, the defendant, who was unarmed, found Alexander at a jitney station and asked to speak to him. Alexander suggested that they step outside, whereupon he pulled a gun on the defendant. Terrell testified that he knew Alexander to carry a knife and believed him to be pulling out the knife, not a gun. When he saw the gun, the defendant panicked, grabbed it, and shot Alexander.

It is clear that the jury could have found that although Terrell had no intention to kill or seriously harm Alexander, his conduct nevertheless was reckless in that "he consciously disregarded a substantial and unjustifiable risk that death or serious bodily injury might result to Alexander

after he 'snatched' the gun." *Commonwealth v. Terrell,
supra,* 482 Pa. at 309, 393 A.2d at 1120.

We disagree with appellant that *Terrell* is indistinguishable from the present case. The similarities appellant underscores, *see* appellant's brief at 14, are insignificant. In the present case, appellant, by his own testimony, was not an unarmed man involved in a close-quarters physical altercation with another man who just had drawn his own weapon. Instead, appellant's testimony reveals that he sought out the victim and approached him in an angry manner, that he did not fear the victim, that he purposely brought his fully loaded semi-automatic hand gun which he concealed in his pants, that when appellant confronted the victim, Bailey stated he did not want to talk to appellant and removed himself to a nearby automobile, that appellant pursued the victim to the car and pulled him out by the legs, that he shot into the ground twice when he was five or six feet away from Bailey to stop him, that the victim ran away and appellant pursued him, and finally, after Bailey had fled over a wall, across a courtyard and into a field, appellant fired a third shot into the victim's back as he tried to escape. We agree with the Commonwealth that by appellant's own testimony, in firing the third shot into the victim's back as he tried to run away, appellant has not placed into issue whether he was acting in a reckless or grossly negligent manner as is required for a finding of involuntary manslaughter. Instead, appellant demonstrated that his firing of the third shot was employed with conscious thought and with no explanation as to why he fired it. As such, the trial court was correct in denying appellant's requested jury instruction on involuntary manslaughter.

Judgment of sentence affirmed.