583 A.2d 428

**COMMONWEALTH of Pennsylvania**

v.

**William LONG a/k/a William A. Long, Appellant.**

Superior Court of Pennsylvania.

Submitted June 25, 1990.

Filed Oct. 26, 1990.

Reargument Denied Jan. 4, 1991.

Petition for Allowance of Appeal
Granted April 8, 1991.

164

Stanton D. Levenson, Pittsburgh, for appellant.

Sandra Preuhs, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before CIRILLO, President Judge, and POPOVICH and HESTER, JJ.

HESTER, Judge:

This is an appeal by William Long from the judgment of sentence of ninety days imprisonment imposed after the trial court found him in civil contempt for failing to testify at the murder and conspiracy trial of Curtis Brandon. Appellant invoked his fifth amendment privilege against self-incrimination, which the trial court determined did not apply since appellant could not have been incriminated as a result of the testimony that was being sought at the Brandon trial. The trial court's conclusion rests primarily on the fact that appellant had testified and had been convicted at his own murder trial stemming from the same murder as the one for which Brandon was being tried. The issue presented is whether appellant properly invoked his fifth amendment privilege under the circumstances presented in this appeal. We conclude that he did not and affirm.

The material facts are not in dispute. Appellant was convicted of third degree murder on May 3, 1989, for his participation in the August 20, 1988 shooting death of Jonathon Bailey. He was acquitted of conspiracy. He was sentenced, and we affirmed on direct appeal. *Commonwealth v. Long*, 397 Pa.Super. 140, 579 A.2d 970 (1990).

At his own trial, appellant testified about the circumstances of the homicide, and during his own direct appeal, appellant related the following as a correct summary of the events surrounding the shooting:

In the early morning hours of August 20, 1989, Appellant received a telephone call from his mother-in-law, Alberta Houston, informing him that his 20–year–old niece, Stephanie had been raped. After receiving this phone call, he woke up his daughter, told her that Stephanie had been raped, telephoned his wife Judy Long at the V.A. Hospital where she worked as a registered nurse, told her what happened, and then proceeded with his daughter to his mother-in-law's house. Appellant arrived there at 9:30 a.m. to find his mother-in-law "hysterical".

Meanwhile, Judy Long had driven to Magee Women's Hospital to get Stephanie and take her to Judy's mother's house where Stephanie lived. When Judy met Stephanie at the hospital, Stephanie was crying and "devastated." Judy and Stephanie arrived at Stephanie's home at around 10:30 a.m. Stephanie was clothed in a bathrobe and still appeared "very hysterical." She immediately took a shower, and Judy returned to work.

About a half an hour later, Stephanie told Appellant that she had been raped. Appellant asked her if she knew who raped her. She said Jonathon Bailey from Homewood (whom Appellant had not known previously) and described the car he was driving. She also told Appellant that Bailey had threatened her that he didn't care who she had told because if she told anyone and they said anything to him he would "f___ them up and he would f___ her up too, and that if she put him in jail, that he was going to kill her when he got out."

About half an hour later, Appellant went to a local bar on Lincoln Avenue, had a beer and then went to Homewood to get some information on Jonathon Bailey. Appellant visited the Homewood Field (also known as Willie Stargell Field) at around 3:00 p.m. Through his investigation, Appellant learned that Bailey would be at Home-

wood Field at approximately 6:00 p.m. to attend football practice for a semi-professional team called the East End Raiders. At around 4:00 p.m., Appellant picked up his wife at work and drove to his mother-in-law's house to get his mother-in-law and Stephanie so Stephanie could report the rape to the Monroeville police. After taking Appellant home at 5:00 p.m., Judy Long, her mother and Stephanie proceeded to the Monroeville police station where Stephanie made her report.

Meanwhile, at around 5:30 p.m., Appellant thought that, since Stephanie was pressing charges against Bailey, he should try to talk to him. Appellant then walked to Homewood Field in search of Bailey. He had a gun for self-protection. When Appellant arrived at the field around 6:00 p.m., he shot basketball for a while and made some inquiries about Bailey. A short time later, Appellant saw his brothers, Dusty and Michael, at the field. Since Appellant had no idea that his brothers would be there, he asked them, "What are you guys doing here?". They said they had "run into a friend" of Appellant's who told them he would be at the Homewood Field. His brothers asked him what was going on, to which the Appellant replied, "I came up here to see this guy about Stephanie." Michael asked if he was all right, and Appellant said, "Yes, I'm all right, you guys don't have to stick around." They said they would wait around anyway.

Five minutes later, a man in a silver gray Chrysler pulled up and parked the car. When he got out, Appel[lant] called, "Hey, Jonathon." Bailey turned around and replied, "What?" Appellant said, "I want to talk to you about Stephanie." Bailey responded, "Stephanie who?". Appellant said, "Stephanie, the girl you raped." Bailey retorted, "F___ you and Stephanie, I don't want to hear that sh___." At that point, Baile[y] walked across the street and started conversing with a Mr. Eackles. Appellant pursued Bailey to let him know that Stephanie had gone to the police to press charges against him and that if Bailey harmed her, he would have to answer to

him. As Appellant approached Bailey and Eackles, Bailey got into Eackles' car with Mrs. Eackles. Appellant then told Bailey, "Now are you going to get out, man, are you going to get out of the mother f_____ car and talk to me like a man, or do you just like to take pussy?" Angered by Appellant's words, Bailey kicked at Appellant and then grabbed a pipe and hit Appellant on the arm as Appellant reached for Bailey's legs. Appellant backed up several feet from the car and Bailey came out, exclaiming: "You want to see me, mother f_____, you want to see me." Appellant pulled out the pistol and fired two shots into the ground in an attempt to stop Bailey. Simultaneously, Dusty Long had come from across the street and hit Bailey in the back with a piece of wood as he grabbed Bailey by the shirt. Bailey then broke loose from Dusty, tearing his shirt, and started running away. Appellant chased him. Bailey ran over the wall and through the courtyard. Appellant yelled, "Stop, man, if this is what you want, stop, mother f_____." As Bailey ran onto the field, Appellant fired his gun from about 124 feet away and hit Bailey in the back, causing him to fall to the ground. Appellant immediately ran up to Bailey. He felt scared for doing something he had not intended to do. Realizing that Bailey was hurt, Appellant turned and ran off the field. Appellant did not see what happened to Bailey after his departure.

*Id.,* 397 Pa.Super. at 144–145, 579 A.2d at 971–72.

Subsequent to his conviction, appellant was subpoenaed to testify at the trial of Curtis Brandon by Brandon's attorney. On June 3, 1989, appellant was adjudged in civil contempt for failing to testify in accordance with that subpoena. At the June 2, 1989 hearing, it was established that in his offer of proof, Brandon's attorney stated that he subpoenaed appellant to testify about the same events which appellant had discussed during his own trial, and the attorney stated that he wanted the testimony to be consistent with appellant's testimony at his own trial since that testimony failed to implicate Brandon. When appellant

invoked his fifth amendment privilege against self-incrimination, the trial court stated that the privilege no longer existed under the circumstances and instructed him to testify. Appellant nonetheless refused five times to testify, and when he invoked the privilege a sixth time, the trial court warned him that he would be subject to contempt under 42 Pa.C.S. § 4132[1] if he did not testify. Appellant continued to refuse to testify. He was adjudged in contempt and sentenced at the June 3, 1989 hearing to a term of imprisonment of ninety days. This appeal followed.

The sole issue presented on appeal is whether appellant properly invoked his fifth amendment privilege against self-incrimination under the circumstances presented. The trial court, in concluding that the privilege did not apply, reasoned that the answers to the questions that would have been asked him in the second trial could not have incriminated him since he already had testified and had been convicted for his participation in the events. The trial court rejected as illusory the claims advanced by appellant as possible incriminatory consequences of testifying at Brandon's trial. Those claims are that: 1) since he was in the process of appealing his own conviction and may have obtained reversal, he could be incriminated by testifying at Brandon's trial in that the testimony might have been used against him at his own retrial; and 2) he may have been subjected to cross-examination at Brandon's trial by the Commonwealth with prior inconsistent statements that he gave in his presentence report; and 3) he could have been subjected to perjury prosecution since his testimony at the Brandon trial would have been inconsistent with that of other witnesses. We concur with the trial court's conclusion that these are not sufficient allegations to warrant application of the privilege in this case.

We first discuss the parameters of the fifth amendment privilege against self-incrimination. When an individual is called to testify in a judicial proceeding, he is not

---

**1.** The trial court specifically determined that the proceeding was for civil and not criminal contempt. Notes of Testimony, 6/3/89, at 4.

excused from answering questions merely by declaring that the answers would be self-incriminating. The trial court must determine if silence is justified, and illusory claims must be rejected. On the other hand, however, for the court to properly overrule the claim of privilege "it must be *perfectly clear* from a careful consideration of all circumstances that the witness is mistaken in the apprehension of self-incrimination and the answers demanded *cannot possibly* have such tendency." *Commonwealth v. Carrera*, 424 Pa. 551, 553–4, 227 A.2d 627, 629 (1967) (emphasis in original); *see also Commonwealth v. McGrogan*, 523 Pa. 614, 568 A.2d 924 (1990); *Commonwealth v. Strickler*, 481 Pa. 579, 393 A.2d 313 (1978).[2]

■ In most cases decided in this Commonwealth, the application of the privilege has been clear in that either the witness was involved in the criminal episode and could invoke the privilege, *see, e.g., Commonwealth v. Carrera, supra, Commonwealth v. Allen*, 501 Pa. 525, 462 A.2d 624 (1983), and *Commonwealth v. Neary*, 355 Pa.Super. 92, 512 A.2d 1226 (1986), or the witness was not involved in the criminal episode and the claim of self-incrimination was illusory. *See Commonwealth v. Rolon*, 486 Pa. 573, 406 A.2d 1039 (1979), and *Commonwealth v. Yabor*, 376 Pa.Super. 356, 546 A.2d 67 (1988). Thus, it is clear that if a witness is involved in the crime, he may invoke the privilege because his testimony may be used to convict him. However, it also is clear that the incrimination must be criminal in nature and that undesirable or unpleasant, but noncriminal, consequences from testimony is not protected by the fifth amendment. *Hoffman v. United States*, 341 U.S. 479, 485–86, 71 S.Ct. 814, 817–18, 95 L.Ed. 1118 (1951).

**2.** On appeal, appellant relies upon the supreme court's decision in *Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977). However, the portion of *Rodgers* that discusses this issue was joined only by two justices. Further, even if *Rodgers* could have been considered precedential prior to *Strickler*, which has a five judge majority, the *Strickler* court made clear that *Rodgers* was no longer controlling on this issue.

In *Commonwealth v. Yabor, supra,* the victim of a shooting refused to testify at the perpetrator's trial because the victim subsequently assaulted the perpetrator and was being prosecuted for that assault. The victim of the shooting believed that the perpetrator would not testify against him in the assault trial if the victim did not testify against the perpetrator in the trial relating to the shooting incident. We concluded that the victim's testimony about the shooting could not possibly subject him to criminal prosecution and that noncriminal but injurious consequences from testimony was not protected under the fifth amendment.

In the case at issue, appellant was tried and convicted for Bailey's murder. More importantly, however, appellant testified himself that he shot the fleeing victim in the back and identified who helped him murder Bailey.[3] Further, he was subpoenaed by the defense at Brandon's trial and asked to testify consistently with his trial testimony. We therefore will examine cases where the defendant asserting the privilege has been prosecuted successfully for the crime and determine whether they uphold application of the privilege under the circumstances presented.

In *Commonwealth v. Strickler, supra,* the court considered whether a defendant could invoke the fifth amendment privilege against self-incrimination when called to testify at the trial of his accomplice. The defendant was subpoenaed to testify by the Commonwealth about a robbery to which he previously had pled guilty. The supreme court noted that normally, entry of a guilty plea operates as a waiver of the fifth amendment privilege against self-incrimination. However, the court recognized that a guilty plea may be overturned on collateral attack through postconviction proceedings. It further did not reject outright the defendant's position that his testimony at his accomplice's trial could have been used against him if he successfully withdrew his guilty plea and the Commonwealth decid-

---

**3.** We note that the fact that appellant did testify at his own trial does *not* operate as a waiver of his privilege against self-incrimination. *Commonwealth v. Hall,* 523 Pa. 75, 565 A.2d 144 (1989).

ed to try him. It concluded that such a possibility, however, was remote.

The court thus refused to adopt a *per se* rule that the privilege either could or could not be invoked once the defendant has pled guilty. It determined that whether the defendant could invoke the privilege following entry of a guilty plea must be decided on a case by case basis by the trial court based on the facts and information available to the trial court when the privilege was invoked.[4] Under the circumstances presented in *Strickler*, the court upheld the trial court's refusal to allow the defendant to invoke the privilege and thus upheld the trial court's adjudication of contempt.

A key factor in the *Strickler* court's decision was the following. The defendant had served his sentence in prison and had pled guilty to receiving stolen property. Thus, it would have been unlikely that the defendant actually would seek to withdraw his guilty plea and face a trial on charges of robbery, conspiracy, and receiving stolen property when he had completed his sentence on the receiving-stolen-property charge. This analysis compels us to look to the realities of the situation presented and acknowledge what may be a false claim of incriminatory possibilities.

■ In the present case, although appellant did not plead guilty to the criminal charges, he was convicted of the crime. As in cases involving guilty pleas, the ordinary rule is that once an individual is convicted of a crime, the privilege against self-incrimination no longer exists as to that crime. *Reina v. United States*, 364 U.S. 507, 518, 81 S.Ct. 260, 264, 5 L.Ed.2d 249 (1960). Thus, appellant's claim of privilege rests on the same possibilities as the court discussed in *Strickler*. In the present case, as in *Strickler*, we defer to the trial court's application of the facts to the law, and we reject this fifth amendment claim as illusory

---

4. The trial court's duty to determine the applicability of the privilege has been reaffirmed in subsequent case law. *See Commonwealth v. McGrogan, supra; see also* 42 Pa.C.S. § 5941(a), although this determination must be supported by a reasoned application of the facts to the claim of privilege. *Commonwealth v. Rolon, supra.*

based on the following important factors: 1) appellant testified at his own trial; 2) his testimony was *self-incriminatory* and established his guilt to the charges of which he was convicted; and 3) he was subpoenaed at his accomplice's trial *by his accomplice* in order to testify consistently with his testimony at his own trial.

Essentially, appellant had implicated himself in the Bailey shooting by his own testimony. He could not have incriminated himself any further by testifying for Brandon. If appellant had not testified in this manner at his own trial, his claim of self-incrimination may not be illusory since any testimony he offered at his accomplice's trial would have incriminated him when he had not done so at his own trial. The reality here, then, is that appellant incriminated himself at his own trial by admitting to actions constituting murder. He was not subjecting himself to any possibility of *further* criminal prosecution. Therefore, the trial court was correct in rejecting application of the privilege.

This analysis is consistent with federal cases discussing the concept. In *United States v. Rodriquez*, 706 F.2d 31 (2d Cir.1983), for example, the second circuit noted that once a defendant pleads guilty, he can be compelled to testify as to the crime to which he pled guilty. Only if the witness is still subject to prosecution for *other crimes*, which his testimony may reveal, does the privilege still remain. *Accord United States v. Pardo*, 636 F.2d 535 (D.C.Cir.1980); *United States v. Yurasovich*, 580 F.2d 1212 (3rd Cir.1978). In the present case, appellant's testimony at Brandon's trial would not have subjected him to prosecution for crimes other than the one for which he stood convicted, based partially on his own testimony.

Appellant next submits that he could have been subjected to penalty for perjury *for his testimony at Brandon's trial* in the event he had testified at that proceeding. His contention, then, is that he should be allowed to invoke the fifth amendment privilege against self-incrimination because he would have lied at Brandon's trial and therefore later could be tried for perjury. The federal courts have

examined whether a possible prosecution for perjury may support invocation of the fifth amendment privilege against self-incrimination. They have rejected categorically the suggestion that a witness may claim the privilege out of fear that he will be prosecuted for perjury for what he is about to say. *See United States v. Tindle,* 808 F.2d 319, 325 (4th Cir.1986); *United States v. Partin,* 552 F.2d 621, 632 (5th Cir.1977); *see also In re Grand Jury Proceedings,* 819 F.2d 981 (11th Cir.1987). The fifth amendment is not a sword to condone perjury; it is a shield to prevent an individual from subjecting himself to criminal prosecution based on his own testimony. Thus, we reject appellant's claims of self-incrimination premised upon possible cross-examination with prior inconsistent statements and possible implementation of perjury charges based on the fact that his testimony at Brandon's trial would have been inconsistent with the testimony of other witnesses.

Accordingly, the judgment of sentence is affirmed.