625 A.2d 630

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William LONG, Appellant.**

Supreme Court of Pennsylvania.

Argued March 12, 1992.

Decided May 26, 1993.

Stanton D. Levenson, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Claire C. Capristo, Sandra Preuhs, Asst. Dist. Attys., Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

ZAPPALA, Justice.

Appellant requested our review of the Superior Court order affirming the judgment of the Court of Common Pleas of Allegheny County, 400 Pa.Super. 163, 583 A.2d 428. The trial court had sentenced Appellant to 90 days imprisonment after having found him in contempt of court for failing to testify at the murder and conspiracy trial of Curtis Brandon. We granted the Appellant's Petition for Allowance of Appeal to review under what circumstances a witness may invoke his Fifth Amendment right against self-incrimination once he has testified at his own trial, has been convicted and sentenced for a related underlying crime, and has expressed his intention to timely file a Notice of Appeal.

Appellant was charged and convicted on May 3, 1989, for his participation in the August 20, 1988, killing of Jonathan Bailey. At the same time, he was also acquitted on conspiracy charges. After the denial of his post trial motions, Appellant was sentenced to a period of incarceration of not less than 10 years nor more than 20 years. Thereafter, Appellant was subpoenaed by defense counsel for Curtis Brandon to testify on Brandon's behalf at his trial on May 26, 1989. The Commonwealth alleged that Brandon was a participant in the killing of Bailey. Brandon's counsel asserted that Appellant's testimony in his own trial exonerated Brandon. In response to the subpoena, Appellant advised the trial judge that the appeal of his conviction would be filed by June 1, 1989, and hence, he would assert his privilege against self-incrimination if compelled to take the witness stand. Based upon this information, the trial court conducted a hearing outside of the presence of the jury to evaluate the Appellant's assertion of his Fifth Amendment privilege.[1]

At this hearing, Appellant argued that compelling his testimony at the Brandon trial could incriminate him for the following reasons:

1. Although Appellant asserts in his brief that he is relying upon the state as well as federal privilege, our review of the record only can find assertion based upon the federal privilege.

1. Appellant intended to appeal his murder conviction and could be retried if Superior Court granted him a new trial;

2. The prosecutor at Brandon's trial had in his possession a pre-sentence report from Appellant's first trial in which Appellant gave statements inconsistent with his trial testimony; and

3. Appellant's testimony at Brandon's trial may have been inconsistent with other testimony developed at Brandon's trial.

Evaluating these arguments, the trial court concluded that the assertion of the privilege was illusory and therefore denied Appellant's right to rely on the privilege. The trial court then directed Brandon's defense counsel to examine Appellant. After the Appellant refused to respond to Brandon's defense counsel's questions for the third time, and after warning the Appellant on each occasion of the unavailability of the self-incrimination privilege, the trial court found the Appellant in contempt of court. After conducting a separate hearing on the contempt charges, the Appellant was sentenced to 90 days in jail to run after completion of his sentence for the murder conviction.

In order to fully understand the parties' positions in this appeal, it is necessary to summarize Appellant's testimony at his murder trial. Because there is no dispute as to Appellant's testimony, we will adopt Superior Court's summarization of that testimony as set forth in its opinion disposing of Appellant's appeal from his murder conviction.

In the early morning hours of August 20, 1989, Appellant received a telephone call from his mother-in-law, Alberta Houston, informing him that his 20–year–old niece, Stephanie had been raped. After receiving this phone call, he woke up his daughter, told her that Stephanie had been raped, telephoned his wife Judy Long at the V.A. Hospital where she worked as a registered nurse, told her what happened, and then proceeded with his daughter to his

mother-in-law's house. Appellant arrived there at 9:30 a.m. to find his mother-in-law "hysterical".

Meanwhile, Judy Long had driven to Magee Women's Hospital to get Stephanie and take her to Judy's mother's house where Stephanie lived. When Judy met Stephanie at the hospital, Stephanie was crying and "devastated." Judy and Stephanie arrived at Stephanie's home at around 10:30 a.m. Stephanie was clothed in a bathrobe and still appeared "very hysterical." She immediately took a shower, and Judy returned to work.

About a half an hour later, Stephanie told Appellant that she had been raped. Appellant asked her if she knew who raped her. She said Jonathon Bailey from Homewood (whom Appellant had not known previously) and described the car he was driving. She also told Appellant that Bailey had threatened her that he didn't care who she had told because if she told anyone and they said anything to him he would "f___ them up and he would f___ her up too, and that if she put him in jail, that he was going to kill her when he got out."

About half an hour later, Appellant went to a local bar on Lincoln Avenue, had a beer and then went to Homewood to get some information on Jonathon Bailey. Appellant visited the Homewood Field (also known as Willie Stargell Field) at around 3:00 p.m. Through his investigation, Appellant learned that Bailey would be at Homewood Field at approximately 6:00 p.m. to attend football practice for a semi-professional team called the East End Raiders. At around 4:00 p.m., Appellant picked up his wife at work and drove to his mother-in-law's house to get his mother-in-law and Stephanie so Stephanie could report the rape to the Monroeville police. After taking Appellant home at 5:00 p.m., Judy Long, her mother and Stephanie proceeded to the Monroeville police station where Stephanie made her report.

Meanwhile, at around 5:30 p.m., Appellant thought that, since Stephanie was pressing charges against Bailey, he should try to talk to him. Appellant then walked to Homewood Field in search of Bailey. He had a gun for self-

protection. When Appellant arrived at the field around 6:00 p.m., he shot basketball for a while and made some inquiries about Bailey. A short time later, Appellant saw his brothers, Dusty and Michael at the field. Since Appellant had no idea that his brothers would be there, he asked them, "What are you guys doing here?" They said they had "run into a friend" of Appellant's who told them he would be at the Homewood Field. His brothers asked him what was going on, to which the Appellant replied, "I came up here to see this guy about Stephanie." Michael asked if he was all right, and Appellant said, "Yes, I'm all right, you guys don't have to stick around." They said they would wait around anyway.

Five minutes later, a man in a silver gray Chrysler pulled up and parked the car. When he got out, Appel[lant] called, "Hey, Jonathon." Bailey turned around and replied, "What?" Appellant said, "I want to talk to you about Stephanie." Bailey responded, "Stephanie who?". Appellant said, "Stephanie, the girl you raped." Bailey retorted, "F___ you and Stephanie, I don't want to hear that sh___". At that point, Baile[y] walked across the street and started conversing with a Mr. Eackles. Appellant pursued Bailey to let him know that Stephanie had gone to the police to press charges against him and that if Bailey harmed her, he would have to answer to him. As Appellant approached Bailey and Eackles, Bailey got into Eackles' car with Mrs. Eackles. Appellant then told Bailey, "Now are you going to get out man, are you going to get out of the mother f___ car and talk to me like a man, or do you just like to take pussy?" Angered by Appellant's words, Bailey kicked at Appellant and then grabbed a pipe and hit Appellant on the arm as Appellant reached for Bailey's legs. Appellant backed up several feet from the car and Bailey came out, exclaiming: "You want to see me, mother f___, you want to see me." Appellant pulled out the pistol and fired two shots into the ground in an attempt to stop Bailey. Simultaneously, Dusty Long had come from across the street and hit Bailey in the back with a piece of wood as he grabbed

Bailey by the shirt. Bailey then broke loose from Dusty, tearing his shirt, and started running away. Appellant chased him. Bailey ran over the wall and through the courtyard. Appellant yelled, "Stop, man, if this is what you want, stop, mother f_____." As Bailey ran onto the field, Appellant fired his gun from about 124 feet away and hit Bailey in the back, causing him to fall to the ground. Appellant immediately ran up to Bailey. He felt scared for doing something he had not intended to do. Realizing that Bailey was hurt, Appellant turned and ran off the field. Appellant did not see what happened to Bailey after his departure.

*Commonwealth v. Long,* 397 Pa.Super. 140, 579 A.2d 970, 971–72 (1990). Noticeably missing from the above narrative is any mention of Brandon. It is for this reason that Brandon's defense counsel sought Appellant's testimony.

■■■ One is guilty of contempt when his conduct tends to bring the authority and the administration of the law into disrespect. *Commonwealth v. Cherry,* 467 Pa. 160, 354 A.2d 894 (1976). Refusal to obey a court order, which occurs in the presence of the court, is contemptuous conduct and may result in a finding of direct contempt. *Commonwealth v. Snyder,* 443 Pa. 433, 275 A.2d 312 (1971). An individual may be found in contempt for refusing to testify after being ordered to do so by the court. *Commonwealth v. Tirado,* 487 Pa. 362, 409 A.2d 392 (1979). That individual, however, may not be held in contempt if the refusal to testify is based upon a legitimate exercise of the privilege against incrimination. *Commonwealth v. Reese,* 467 Pa. 107, 354 A.2d 573 (1976). However, in *United States v. Partin,* 552 F.2d 621, 632 (5th Circuit), cert. denied 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), the Fifth Circuit Court of Appeals cogently set forth the law with regard to the use of the privilege to protect against prosecution for perjury for what that witness was about to say:

A witness may not claim the privilege out of fear that he will be prosecuted for perjury for what he is about to say, although he may claim the privilege if his new testimony

might suggest that he had perjured himself in testifying on the same subject on a prior proceeding.

In the first instance, the trial judge must evaluate the use of the privilege against self-incrimination to determine whether that proposed use is real or illusory. *Commonwealth v. McGrogan*, 523 Pa. 614, 568 A.2d 924 (1990). A trial court's ruling regarding the application of the privilege will not be disturbed on appeal absent a showing of an abuse of discretion. *Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977). An abuse of discretion has been defined as:

> Not merely an error of judgment, but if in reaching a conclusion, the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will as shown by the evidence or the record, discretion is abused.

*Kelly v. County of Allegheny*, 519 Pa. 213, 217, 546 A.2d 608, 610 (1988) citing *In Re: Women's Homeopathic Hospital of Philadelphia*, 393 Pa. 313, 316, 142 A.2d 292, 294 (1958).

The issue before us, then, is whether the trial court abused its discretion in concluding that Appellant's refusal to testify was based upon an illusory exercise of his right to remain silent.

In *Commonwealth v. Carrera*, 424 Pa. 551, 227 A.2d 627 (1967), the appellant was subpoenaed to testify before a grand jury regarding statements she gave to the police to the effect that a certain physician and nurse had performed an abortion upon her. Before the grand jury she asserted her privilege against self-incrimination. As a result of her action, she was brought before a judge who ordered her to respond to the district attorney's questions. When she refused to answer the questions even after being directed to do so by the court, the trial court found her in contempt.

In reversing the trial court, we set forth the following guidelines with respect to the exercise of the privilege against self-incrimination and the trial court's evaluation of that exercise.

... [I]t is not necessary that a real danger of prosecution exists to justify the exercise of the privilege against self-incrimination. It is sufficient if the person questioned has reasonable cause to apprehend such danger. Moreover, the privilege extends not only to the disclosure of facts which would in themselves establish guilt, but also to any fact which might constitute an essential link in a chain of evidence by which guilt can be established.

When an individual ... is called to testify ... in a judicial proceeding, he or she is not exonerated from answering questions merely upon a declaration that in so doing it would be self incriminating. It is also for the court to judge if the silence is justified, and an illusory claim should be rejected. However, for the court to properly overrule the claim of privilege, it must be *perfectly clear* from a careful consideration of all the circumstances, that the witness is mistaken in the apprehension of self-incrimination and the answers demanded *cannot possibly* have such a tendency. (Citations omitted.) (Emphasis in original.)

424 Pa. at 553, 227 A.2d at 629. Applying this rationale to the facts, we concluded that the defendant was entitled to exercise the privilege. Even though the defendant could not be prosecuted for her part in the abortion, there was nothing to prevent her from being prosecuted for fornication. Even though the danger of prosecution for fornication was remote, such a possibility presented a reasonable cause for the defendant to be apprehensive. Hence, rejection of the privilege was an abuse of discretion.

Next, in *Commonwealth v. Rodgers*, supra, we were confronted with a situation in which a witness invoked the privilege against self-incrimination because of fear that anything he stated could be used against him in a subsequent trial if his habeas corpus proceeding was successful.

Defendant was charged and convicted of first-degree murder, aggravated robbery and burglary. During his case in chief, defendant called upon four of his sisters to substantiate his alibi defense. Specifically, defendant elicited testimony from his four sisters that during the time the crime occurred

he was attending a birthday party in his honor some distance from the victim's house. In rebuttal, the Commonwealth subpoenaed Otis Ferguson, one of the alleged participants in the crime. On the stand, Ferguson initially testified that he was convicted of murdering the same victim defendant stood accused of murdering, and was serving a lifetime term of imprisonment. Furthermore, he testified that his conviction was upheld by the Pennsylvania Supreme Court and review was denied by the United States Supreme Court. He then refused to answer any further questions relying upon the privilege against self-incrimination and the fact that he was seeking collateral review of his conviction. Over the Commonwealth's objection, the trial court sustained Ferguson's assertion of the privilege. The Commonwealth was then permitted, over defendant's objection, to read into evidence Ferguson's testimony from defendant's preliminary hearing. Defendant then appealed to this Court arguing that the admission of Ferguson's testimony from the preliminary hearing was improper because the trial court erred in permitting Ferguson to invoke the privilege against self-incrimination.

We first reaffirmed our holding that the waiver of the privilege against self-incrimination in one proceeding does not affect the right to exercise it in another proceeding. Thus, the fact that Ferguson voluntarily testified at the preliminary hearing did not in and of itself preclude him from invoking the privilege at defendant's trial. Defendant then argued that the trial court erred in declaring Ferguson unavailable, thereby permitting the Commonwealth to use the transcript from the defendant's preliminary hearing, based upon the privilege against self-incrimination when Ferguson was convicted for the occurrence out of which the privilege was claimed and had exhausted his direct appeals. In response, we stated:

After conviction, the direct and collateral remedies available to an individual may result in a new trial. It is apparent, then, that a conviction does not eliminate the possibility that an individual will later be prosecuted for the crime about which he is asked to testify. Accordingly, the weight of authority permits a witness whose conviction has not been

finalized on direct appeal to invoke the privilege against self-incrimination and refuse to testify about the subject matter which formed the basis of his conviction. (Citations omitted.)

472 Pa. at 455, 372 A.2d at 780.

However, in *Rodgers,* Ferguson had exhausted his direct appeals and was seeking collateral relief through a habeas corpus proceeding. A plurality of this Court[2], concluded that like a direct appeal, a collateral appeal can result in a new trial. Therefore, we left the determination of whether such a defendant may invoke the privilege to the sound discretion of the trial court. The trial court would have to consider all of the circumstances and decide whether the witness had a reasonable cause to apprehend the danger of self-incrimination. Finding that Ferguson's collateral attack did not appear to be frivolous, we concluded that the trial court did not abuse its discretion in permitting Ferguson to invoke the privilege.

A year later, in *Commonwealth v. Strickler,* 481 Pa. 579, 393 A.2d 313 (1978), we were confronted with a situation in which the defendant had pled guilty to a charge of being an accessory after the fact to an armed robbery. After defendant completed his sentence on the accessory charge, he was subpoenaed to testify at the trial of the man accused of being the principal of the same robbery. Rather than testifying, defendant invoked the privilege against self-incrimination. At that point, the trial court advised the defendant that in light of the fact that no appeal had been taken, he had no grounds to fear further prosecution. In spite of the court's directive to testify, the defendant refused, resulting in the trial court finding appellant in contempt.

We affirmed defendant's conviction for contempt concluding that the defendant had no reasonable basis to fear prosecution

2. Although then Justice Nix (now Chief Justice) dissented from the plurality's view, it appears that he did so because Appellant was collaterally attacking his conviction. It seems Justice Nix agreed with the general proposition that a witness whose conviction has not been finalized on direct appeal has the right to invoke the privilege. See *Commonwealth v. McGrogan,* supra.

on a charge for which he had already completed a sentence. Citing *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), we concluded that since the defendant had completed his sentence, double jeopardy would require that defendant receive credit for that sentence in any subsequent new trial. Therefore, it would seem improbable that a prosecutor would retry an individual for whom the sentence had already been served.

More recently, in *Commonwealth v. McGrogan,* supra, we addressed the issue as to whether a witness may invoke the privilege against self-incrimination when the substance of his testimony is known. In *McGrogan,* Roland Steele was incarcerated in the Allegheny County jail at the same time as the defendant. It was alleged that the defendant approached Steele to solicit him to kill the witnesses responsible for the defendant's arrest. Instead of carrying out this task, Steele took this information to the police. The defendant was then arrested for criminal solicitation. At McGrogan's trial, the Commonwealth attempted to introduce the preliminary hearing testimony of Steele since Steele invoked the privilege against self-incrimination. Over defense counsel's objections, the trial court declared Steele unavailable, as a result of the privilege, and admitted his preliminary hearing testimony. The Superior Court reversed the judgment of sentence and granted the defendant a new trial based upon the trial court's ruling permitting the Commonwealth to use Steele's preliminary hearing testimony.

On appeal, we affirmed the Superior Court. First, we distinguished the Steele circumstances from those instances in which a witness has not testified so that the content of his testimony is unknown. In those instances, " . . . it is perfectly reasonable to consider the effect of extrinsic evidence upon the potential witness's fear that his own testimony will be incriminating." 523 Pa. at 624, 568 A.2d at 929. However, we continued by stating that:

"Where other evidence tends to implicate the witness in criminal activity, the witness may have justification for

invoking his Fifth Amendment privilege to prevent being harmed by his own words."

*Id.*

We distinguished the above scenario from one in which it is clear that the previous testimony of the witness absolves that witness from any wrongdoing. In that instance, we concluded that mere suspicion of criminal prosecution was insufficient to justify the invocation of the privilege. However, it is important to point out that in *McGrogan,* Steele did not argue and the Commonwealth did not pursue what criminal charges Steele could be subjected to if required to testify.

Reviewing the invocation of the privilege in this appeal in light of the above case law, we must conclude that the trial court abused its discretion. The Appellant has offered valid reasons as to why his testimony may incriminate him. It is clear that appellant is arguing that if compelled to testify, information solicited during his cross-examination could result in perjury charges being filed against him.

Appellant argues that he would testify at Brandon's trial on direct examination consistent with his testimony at his own trial. His concern is not with his direct examination, but rather the prosecutor's cross examination. He argues that the prosecutor was armed with inconsistent evidence from a pre-sentence report, as well as inconsistent evident from various witnesses. These inconsistencies then could form the basis of a perjury charge.

Contrary to Appellant's assertion, the Commonwealth argues that Appellant's reliance upon the privilege is illusory. The Commonwealth argues that the statements given to the pre-sentence investigator were not under oath and therefore could not serve as the basis of a perjury charge. Likewise, if the Appellant testified consistent with his testimony at his trial, the fact that other witnesses presented contradictory testimony was inconsequential since witnesses often differ in trial testimony. This inconsistency would be insufficient to pursue perjury charges.

█ It is quite clear that a witness cannot use the privilege as a protection against what that witness is about to say. Rather, the privilege is used to prevent current statements from serving as a basis to establish prior criminal conduct. In other words, the current testimony would not serve as the basis of the perjury but rather a confession that the prior sworn testimony was false. (See for example *Commonwealth v. Nelson,* 393 Pa.Super. 611, 574 A.2d 1107 (1990).) The previous sworn testimony would be the perjured statements with the latter testimony constituting the truth. Under this analysis, a defendant might be justifiably concerned that his current testimony could provide an essential link to a wholly different criminal episode, i.e., perjury, than one for which he had previously been convicted, i.e., murder. It is conceivable that the appellant could testify during cross examination that the statements made in the pre-sentence report were accurate which then could make his testimony at his own trial perjurious. Hence, it is plausible that the prosecutor in the appeal *sub judice* could use the Appellant's testimony in Brandon's trial as a basis for seeking a perjury conviction.

█ The fact that the district attorney had not pursued such a charge heretofore, even though armed with alleged inconsistency, is of no moment. The fact remains that he could have and that this possibility creates sufficient apprehension in the Appellant to believe he might incriminate himself if he testified at Brandon's trial.[3] As we stated in *Carrera,* the danger need not be *real,* but merely that the witness has a *reasonable* cause to apprehend danger. To justify denial of the privilege, it must be *perfectly clear* that by testifying the witness cannot possibly incriminate himself through that testimony.

Applying the facts to the above principles, we must conclude that it is not perfectly clear that the Appellant had no reasonable cause to doubt he could possibly incriminate himself with

3. Of course, the prosecutor could have dispelled any doubt in anyone's minds as to his motives by granting the Appellant immunity. This, however, was not done.

regard to a potential perjury charge. Therefore, we must conclude that the trial court abused its discretion.

The order of the Superior Court is reversed and the judgment of sentence regarding the conviction for contempt is vacated.

PAPADAKOS, J., concurs in the result.

McDERMOTT, J., did not participate in the decision of this case.