584 A.2d 980

**COMMONWEALTH of Pennsylvania**

v.

**Howard C. WEISMAN, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 27, 1990.

Filed Dec. 21, 1990.

David J. Foster, Lemoyne, for appellant.

Andrea F. McKenna, Deputy Atty. Gen., Harrisburg, for Com.

Before CAVANAUGH, BECK and POPOVICH, JJ.

BECK, Judge:

The appellant, Howard Weisman, was convicted by a jury of kidnapping for his part in the ambush and murder of Richard Harry Good. The issue he raises in this appeal is whether he is entitled to a new trial because the Commonwealth failed to reveal to the jury that one of its witnesses against him had been made certain promises of leniency in exchange for his testimony at appellant's trial. Although we hold that the prosecution erred in concealing its agreement with the witness from the defense and the jury, a careful review of the evidence convinces us that the error could not reasonably have contributed to the verdict. Therefore, we affirm.

The evidence upon which appellant's conviction rests is as follows. On July 14, 1982, a group of friends were gathered at the bungalow of Michael Slote, which was situated on the property of Slote's Nursery in Berks County. Present at the time were Michael Slote, Randy Haag, Van Peters, Michael Sands and the appellant, Howard Weisman. Another man, Bruce Ream, was in the bungalow also but was in his bedroom during most of the evening and did not participate in the capture and disposal of the victim, Good. The victim apparently was expected to arrive at Slote's bungalow in order to turn over to Slote and Haag the victim's Corvette and its ownership papers. The car was being offered by Good in satisfaction for money owed in connection with drug trafficking. Slote warned Good to come alone to the bungalow. Just before Good was expected, Slote told Haag, Peters, Sands and Weisman to hide in his (Slote's) bedroom so that Good would not be frightened or suspicious when he arrived. Slote also handed Sands a .22 caliber rifle and instructed Sands to hold it in case

Good was carrying a weapon. When Good arrived Slote led him back into his bedroom on the pretext that that was where he stored his drugs. Immediately Slote grabbed Good from behind, Haag grabbed the rifle from Sands and hit Good with it and began shouting at him. Appellant grabbed Good's feet and threw him to the floor. Sands and Peters restrained Good while Weisman got rope and tied him up. Tape was placed over Good's mouth. Haag took Good's wallet and ring. Then Weisman and Slote carried the bound and gagged victim downstairs to the basement. Meanwhile, Haag announced to the victim, "You're going swimming."

Sands and Peters were instructed to watch over Good while Weisman and Haag drove Haag's car to the exterior basement door. After that, Haag gave Peters and Sands the papers and keys to Good's Corvette and about two hundred dollars and told them to drive the car to Florida. When Peters and Sands left Slote's house, Good was still in the basement, tied up but alive.

A short time later, Bruce Ream, still in his bedroom, could hear and see Haag's car drive away from the bungalow down a back lane towards the rear of the nursery property. Minutes later, Ream heard a single gunshot. The following day, Haag and Weisman warned Bruce Ream to keep his mouth shut and forget anything that happened the night of Good's disappearance.

About a week later, Good's body was found by a fisherman, floating in the Susquehanna River. Good's body had been wrapped in carpet remnants and then secured with several feet of chain which had been fastened by locks and then attached to cinder blocks to weigh it down. Good had suffered a single gunshot wound through the head.

Meanwhile, Sands and Peters had delivered Good's Corvette to Florida and disposed of it according to telephone instructions received from Haag. Sands returned from Florida and this ended his involvement in the incident and

also ended his contact with the other perpetrators.[1]  Peters, however, was called upon to do additional "favors" for Weisman and Haag.  At their request, Peters went to Haag's garage and picked up all the carpet remnants which were stored there.  At first, Peters discarded the remnants at a dump at the Reading Boat Works.  However, Weisman and Haag were unhappy with Peters' choice of disposal site and, therefore, they made Peters retrieve the carpet pieces. Thereafter, Weisman accompanied Peters to another landfill where the carpet scraps were finally deposited.

Shortly after the discovery of Good's body, appellant returned to the hardware store at which, a couple of weeks before, he had purchased a length of chain and locks. Appellant attempted to convince the sales person to locate the receipt and his charge card slip and return them to him.

Since, in 1982, no eyewitnesses were immediately forthcoming to the instant murder, a grand jury investigation was begun.  Sometime during the course of the investigation, in early 1984, Bruce Ream had a conversation with appellant in which appellant confided to Ream that he (Weisman) had been subpoenaed to the grand jury but he had not responded.  He further boasted that the Commonwealth had "nothing" in the way of evidence.  Weisman warned Ream again to keep his mouth shut and not to worry because they had gotten away with "the crime of the century."  Ream told Weisman, "If you wouldn't have threw [sic] the body in three feet of water with four foot of chain it would never have been."  To this Weisman retorted, "I can't plan everything right."  At trial, Bruce Ream testified to these conversations with appellant.

Apparently, Ream was not the only person to whom appellant bragged about his role in Good's murder.  An ex-classmate of Weisman's, James Aguiar, was in the Berks County prison for nonsupport and talked with Weisman

1. In 1982 the year this murder occurred Michael Sands had been living in Hawaii.  He had returned that summer to the Reading area for a high school reunion and had been out socializing with old high school friends when the kidnapping and murder were committed.

after Weisman's arrest. Weisman boasted that he had planned Good's murder with Slote and Haag. He stated that Haag had financed it and that he and Slote had received money and drugs from the operation. Further, Weisman was confident that he would "get off" and then sue the Commonwealth. Weisman suggested to Aquiar that it would be "nice" if "something happened" to Peters and Sands before his trial began. Aguiar's testimony was also introduced at trial.

Finally, another individual, Steve Grynastyl, who had had drug dealings with appellant, Haag and Slote testified for the Commonwealth. Grynastyl described an earlier, aborted plot on Richard Good's life. Apparently, Haag, Slote and Weisman decided that Good had to be killed because "he kept ripping them off" and causing trouble. The three men summoned Grynastyl and tried to convince him to shoot Good, offering him $5,000 to do so. The plan was not carried out the night Grynastyl was there but, as the evidence showed, the murder was successfully executed weeks later.[2]

At trial, Van Peters, Michael Sands, Bruce Ream, Steve Grynastyl and James Aguiar all testified for the Commonwealth. At the time of appellant's trial Peters and Sands were also charged with kidnapping for their roles in the Good killing. Ream also had unrelated criminal charges recently dropped by the prosecution in a move which evidently had nothing to do with the fact that Ream was testifying for the Commonwealth in appellant's trial. To undermine the credibility of the witnesses against him appellant theorized that Peters, Sands and Ream were testifying in order "to save their own necks." This theory and the following alibi defense constituted appellant's defense at trial. In support of his alibi appellant testified that although he had been at Slote's bungalow earlier in the

2. Weisman learned that sometime later, in early 1984, Steve Grynastyl was summoned to testify before the investigating grand jury. In anger, Weisman told Bruce Ream that Grynastyl "will be the next one to go" and that it was necessary to "get over these little stepping stones to get ahead."

evening of the murder, he had left there to spend the night with his girlfriend. He denied participation in the kidnapping and murder and claimed that he was a victim of "guilt by association."

The jury convicted appellant of kidnapping and acquitted him on the murder charge. Following the denial of post-trial motions appellant was sentenced to six to twenty years imprisonment. Appellant appealed to this court. One of the issues raised by appellant caused this court, in a memorandum opinion filed on March 30, 1988, to remand the case for an evidentiary hearing. Appellant claimed that although Peters, Sands and Ream all testified that they had not secured any promises of leniency from the Commonwealth in return for their testimony, after trial he discovered that plea agreements which benefited the witnesses were in existence. In order to determine the evidentiary basis, if any, for appellant's claim, we remanded for a hearing.

The trial court held an extensive hearing on April 4, 1989. At the hearing Peters' and Ream's attorneys testified and a deposition and various office memoranda and letters from Sands' attorney were introduced. At appellant's trial Peters had testified that the only arrangement he had with the Commonwealth was that they would inform the sentencing judge that Peters had cooperated in the prosecution of the main perpetrators, Slote, Haag and appellant. At the 1989 hearing, Peters' attorney, John Boccabella, confirmed that the only agreement he and his client had with the Commonwealth with respect to the Good murder case was that if Peters cooperated and testified truthfully "that cooperation will be made known to the Court at the time of his sentencing." Likewise, Bruce Ream's attorney testified that the unrelated criminal charges which had been pending against Ream prior to appellant's trial were not the subject of any "deals" with the Commonwealth. Ream's attorney, David Dautrich, emphatically stated that the Commonwealth refused to offer any deals in exchange for testimony and that Ream had decided on a course of cooperation and full disclosure prior

even to retaining an attorney. Mr. Dautrich stated that the charges pending against Ream had been nol prossed primarily as a result of his strenuous "lobbying" and in part because the complaining witness was unenthusiastic about continuing to press charges. Based on the attorneys' testimony the trial court found that neither Peters nor Ream had misled the trial jury when they stated that their testimony was not secured as the result of undisclosed promises or agreements with the prosecution. We find nothing in the record which would lead us to conclude otherwise.

■ However, the testimony of Michael Sands is more troublesome. At trial, on direct examination and again on cross-examination, Sands asserted that no promises or representations regarding his pending kidnapping charge had been made to him by the Commonwealth in exchange for his cooperation with the prosecution of Slote, Haag and appellant. Thereafter, during closing argument, the prosecutor argued to the jury that although he was "sure that [Sands] hopes that by cooperating that he will get lesser treatment or less severe treatment" that Sands "has no promise as to what his treatment will be." The prosecution further argued in closing that "there is no reason for [Sands] to admit that he was standing around with a gun because in the Commonwealth of Pennsylvania to commit a crime with a gun in your visible possession gets you a mandatory sentence in jail." The prosecutor added, "If [Sands] were making this up and there was some notorious plot to get Howard Weisman, there would certainly be no reason for Michael Sands to admit something that guarantees that jail sentence, no reason at all."

However, despite Sands' blanket claims that no agreements had been struck with the Commonwealth and the prosecutor's indefensible endorsement of this representation, the evidence at the remand hearing established otherwise. Appellant's counsel introduced into evidence the deposition of Sands' attorney, George Newman, and numerous additional documents from Mr. Newman's files. This evidence clearly demonstrated that Sands had entered into an

agreement with the Commonwealth wherein he was promised that, in exchange for his cooperation, the Commonwealth would notify the sentencing court of his cooperation and would not oppose a sentence below the guidelines. Sands' attorney made clear that since he understood the guidelines to provide for a two year term of imprisonment for kidnapping, he took the agreement to mean that the Commonwealth would not oppose a sentence of less than two years for his client. Moreover, the letters and memoranda introduced at the remand hearing made it reasonable to infer that both Sands *and the prosecutor trying the Weisman case* were aware of this agreement before the start of trial. Based on the evidence at the remand hearing the trial court found that the Commonwealth indeed had made a "promise" to Sands relating to his treatment on the kidnapping charge. The trial court found further that the prosecution should not have permitted Sands to mislead the jury in this regard. Finally, however, the trial court found that the error did not entitle appellant to a new trial because of the overwhelming independent evidence of guilt, the cumulative nature of Sands' testimony and the "extremely limited effect of the Commonwealth's understanding with Sands." While we agree with the trial court's conclusion, we add a word of admonition regarding the prosecution's conduct in the instant case.

The prosecutor here had an indisputable duty to correct the testimony from Sands that "no promises or representations" had been made to him regarding the charge of kidnapping. *See, e.g., Commonwealth v. Hallowell,* 477 Pa. 232, 383 A.2d 909 (1978); *Commonwealth v. Floyd,* 259 Pa.Super. 552, 393 A.2d 963 (1978). Here, not only did the prosecutor fail to disclose the existence of the agreement to defense counsel or the court or the jury, he compounded his breach of duty by deliberately eliciting the misinformation from the witness and then arguing the misinformation to the jury in order to bolster Sands' credibility. He created the misleading impression with the jury that Sands expected absolutely nothing from the Commonwealth in exchange for

his truthful testimony and actually intimated to the jury that by testifying Sands was exposing himself to a mandatory jail term.[3] Given the fact that the prosecutor's office and the trial prosecutor in particular were aware of the Commonwealth's agreement to stand mute in the face of a sentence which fell below recommended guidelines, the prosecutor's conduct was unpardonable.

■ With this said, however, we conclude with equal confidence as did the trial court that the error here did not contribute to the verdict. It is settled that an error is harmless where the properly admitted evidence is so overwhelming and where the prejudicial impact of the error is so slight that it can be concluded beyond a reasonable doubt that the error could not have contributed to the verdict. *Commonwealth v. McGrogan,* 523 Pa. 614, 568 A.2d 924, 930 (1990) (quoting *Commonwealth v. Story,* 476 Pa. 391, 412–13, 383 A.2d 155, 162 (1978)). The harmless error doctrine reflects a fundamental principle which we think is particularly apt here, i.e., "that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the fundamental fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). If this court can conclude beyond a reasonable doubt that the error complained of did not contribute to the verdict, no new trial is required.

In the instant case, appellant's role in the kidnapping of Good was established by overwhelming evidence apart from the testimony of Michael Sands. Peters and Ream independently corroborated every detail of Sands' story. Moreover, both Peters and Ream provided further inculpating evi-

---

**3.** The trial court subsequently instructed the jury that although it was the law in Pennsylvania that visible possession of a firearm under these circumstances carried a mandatory jail term, the was no reason to believe that Sands knew of this law when he described his participation in the Good kidnapping. The trial court urged the jury to keep that in mind while assessing credibility.

dence regarding the disposal of the carpet scraps and incriminating statements by Weisman after the murder. In addition there was evidence of the purchase of the chain which wrapped Good's drowned body and appellant's attempts to retrieve the sales slip after Good's body was recovered. Next, there was evidence from Grynastyl regarding former plots to kill Good by appellant and his accomplices. Further, there was the testimony of Aguiar regarding appellant's confessed participation in the scheme. None of the above-mentioned, unimpeached testimony depended in any way on the testimony of Sands. Finally, although we condemn the prosecution's concealment of their promise not to oppose a lower-than-guidelines sentence for Sands we find that, in the context of this case and in view of the overall reliability of Sands' testimony, revelation of the promise would have had minimal impeachment potential. Therefore, we agree with the trial court that, since the error found here could not have contributed to the verdict, appellant is not entitled to a new trial. Judgment of sentence affirmed.