568 A.2d 924

COMMONWEALTH of Pennsylvania, Appellant,

v.

Robert McGROGAN, Appellee.

Supreme Court of Pennsylvania.

Argued March 10, 1989.

Decided Jan. 17, 1990.

616

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Deputy Dist. Atty., Scott A. Bradley, Asst. Dist. Atty., Pittsburgh, for appellant.

Robert M. Barrett, Pittsburgh, (Court–Appointed), for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

Appellee, Robert McGrogan, was convicted of two counts of criminal solicitation, 18 Pa.C.S. § 902(a). He appealed this conviction to the Superior Court, which reversed the trial court and ordered a new trial, 367 Pa.Super. 394, 532 A.2d 1203. This appeal by the Commonwealth followed, and allocatur was granted to address the issue of the propriety of the Superior Court's disposition of this matter. For the following reasons, we now affirm the order of the Superior Court.

In April, 1974, the Pittsburgh police arrested Mary and Donna Hoegrel, mother and daughter, for possession and sale of a controlled substance. Mary Hoegrel agreed to cooperate with police efforts to arrest Robert McGrogan, her supplier, and at their request telephoned McGrogan to arrange delivery of a quantity of a controlled substance.

The police were able to effectuate the arrest of McGrogan as he arrived at Hoegrel's home.[1] While awaiting trial on the drug charges, McGrogan was committed to the Allegheny County jail where the Commonwealth charges that he offered money and drugs to Roland Steele if, in return, Steele would kill the Hoegrels. As a result, McGrogan was arrested and subsequently convicted of criminal solicitation for his activity in connection with the alleged plan to kill the Hoegrels. This conviction is the subject of the instant appeal.

The evidence adduced at trial conflicted as to whether McGrogan or Steele had conceived the plot to murder the Hoegrels. The testimony of a prison inmate of McGrogan's and that of the Hoegrels supported the Commonwealth's theory that McGrogan had approached Steele with the proposition. An investigating officer then produced two slips of paper, given to him by Steele, upon which were written the names, address, and telephone number of the Hoegrels.

At that point, the Commonwealth announced its intention to read into evidence the preliminary hearing testimony of Roland Steele. This was done because, immediately before trial, the prosecutor informed the trial court that Steele would be unavailable to testify because he intended to invoke the Fifth Amendment. The following exchange took place *in camera:*

THE COURT: You heard the representation of the Commonwealth attorney, Mr. Awesh, who said he spoke to your attorney, and your attorney had indicated that you would, if called to be a witness for the Commonwealth in this case, that you would take the fifth amendment. Is that correct?

MR. STEELE: Sure.

THE COURT: Is there any question that you would like to ask Mr. Steele?

MR. AWESH: No. I believe that's all.

THE COURT: Thank you, Mr. Steele.

1. The present record does not reveal the disposition of those charges.

(N.T. 10/8/85, p. 4)

Defense counsel objected to the admission of the preliminary hearing testimony of Roland Steele in the trial of this matter, stating:

> I'm going to object to [the prosecutor's] reading [the testimony] for lots of reasons. First of all, I believe that it denies the Defendant the right to confrontation in terms of the witnesses in the proceedings.
>
> I'm denied the opportunity to cross-examine the man. The jury is denied an opportunity to observe his demeanor and to find out, you know, anything about his background, and for those reasons, I would object.

(N.T. 10/9/85, p. 57) [2]

Over objection, the trial court admitted the transcript. Steele's testimony at the preliminary hearing revealed that McGrogan had solicited Steele at least four times to kill the Hoegrels during Steele's stay at the prison between May 18, 1984, and May 22, 1984. Further, the transcript revealed McGrogan offered Steele drugs and increasing amounts of money to murder the witnesses. McGrogan supplied Steele with descriptions of the house and the intended victims. This testimony was corroborated by pieces of paper bearing descriptions of the house and intended victims; the papers were surrendered by Steele to the investigating officer. The transcript further indicated that he had repeatedly declined McGrogan's propositions.

Three inmates testified during the defense that Steele had offered his "services" to McGrogan, and that McGrogan mistrusted Steele and rejected his overtures. McGrogan himself testified in support of the latter version of events, stressing that he was never aware that the Hoegrels intended to testify against him.

The Commonwealth presents three issues for our review. The Commonwealth first alleges that the Superior Court

---

2. The Commonwealth notified the trial court of Steele's wish to invoke the Fifth Amendment on the first day of trial before the jury was empanelled. (N.T. 10/8/85 p. 4) The Commonwealth sought to introduce the transcript on the second day of trial, at which point defense counsel objected. (N.T. 10/9/85, p. 57)

erred in addressing the issue of whether Steele was properly allowed to invoke his Fifth Amendment privilege. According to the Commonwealth, this issue was waived by the defendant and should not have been reached by the Superior Court. The Commonwealth cites *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975), in support of its contention that defense counsel's general objection at trial [3] was insufficient to preserve the more specific allegation that there was no factual basis to support Steele's invocation of the Fifth Amendment privilege.

Two issues are presented in this argument: first, whether the failure of the defense to object to the invocation of the privilege constituted a waiver of an objection to the admissibility of the preliminary hearing transcript; and second, whether the ruling permitting the invocation of the privilege by Steele was correct. Turning to the waiver question, we find it to be convoluted and meritless. The waiver argument is fallacious because it rests upon the mistaken premise that appellee herein had the responsibility of challenging the allowance of the invocation of the Fifth Amendment privilege by Steele. The appellee, as the defendant in the trial below, did not seek to call Mr. Steele as a witness. The party seeking to use the evidence to be supplied by Mr. Steele was the Commonwealth. It is the responsibility of the party who is offering the witness to respond to any objection that would prevent that witness' testimony. It should be self-evident that the party against whom the evidence is sought to be offered should not be expected to support its introduction.

Moreover, the Commonwealth's argument fails to perceive the distinction between the decision upholding Mr. Steele's right to not be compelled to testify and the subsequent ruling admitting the earlier testimony of Mr. Steele. The former ruling was not adverse to appellee's position, and thus appellee had no obligation to object. The subsequent ruling was adverse to Mr. McGrogan and a prompt objection was made. It is also to be noted that the Com-

---

**3.** *See supra* at p. 926.

monwealth did not object to the initial ruling, although they should have realized the basis for their subsequent request would depend upon the sufficiency of the record made in support of the first ruling. The fact that the original error provided the grounds for appellee's subsequent argument does not eradicate the Commonwealth's dereliction in failing to challenge the basis upon which the trial court premised its ruling sustaining the invocation of the Fifth Amendment privilege.

The concept of waiver in this context must be predicated upon an underlying premise that a party has failed, through inaction or inattentiveness, to preserve an objection that would be favorable to that party. In this instance there was no obligation upon the defense, when the court initially ruled upon the propriety of the invocation of the privilege, to attempt to correct an erroneous judgment where the result of that ruling would inure to the benefit of the defendant. When the Commonwealth proceeded to rely upon the prior ruling to the detriment of the defense, it was then appropriate for the defense to challenge its validity. To rule otherwise would completely ignore the adversarial nature of a trial.

We turn now to a consideration of whether the trial court properly admitted the transcript of Mr. Steele's testimony in the prior proceeding. The answer to this question hinges upon whether the trial court was correct in determining that the Fifth Amendment privilege was properly invoked. Under both our federal and state constitutions, an accused in a criminal trial has a right to confront witnesses bearing evidence against him. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *Commonwealth v. Russo*, 388 Pa. 462, 131 A.2d 83 (1957); *Commonwealth v. Johnson*, 348 Pa. 349, 35 A.2d 312 (1944); *Commonwealth v. Cronin*, 336 Pa. 469, 9 A.2d 408 (1940). However, it has been firmly estab-

lished that where a witness properly invoked his or her Fifth Amendment privilege, testimony of that witness in an earlier proceeding may be used, under proper circumstances, in a subsequent proceeding without offending the right of confrontation. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *In re Corrugated Container Anti–Trust Litigation*, 661 F.2d 1145 (7th Cir.1981), *aff'd Pillsbury v. Conboy*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1981); *United States v. Zurosky*, 614 F.2d 779 (1st Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *Commonwealth v. Sandutch*, 498 Pa. 536, 449 A.2d 566 (1982); *Lepley v. Lycoming County Court of Common Pleas*, 481 Pa. 565, 393 A.2d 306 (1978); *Commonwealth v. Duncan*, 473 Pa. 62, 373 A.2d 1051 (1976). The offsetting considerations are the witness' right against self-incrimination, *United States v. Thornton*, 733 F.2d 121, 236 U.S.App.D.C. 29 (1984); *United States v. Goodwin*, 625 F.2d 693 (5th Cir.1980); *United States, ex rel. Tatman v. Anderson*, 391 F.Supp. 68 (D.C.Del.1975), and the fact that the prior testimony was elicited under circumstances which bear the indicia of reliability. *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Mattox v. United States, supra.* The first consideration is implicated in the instant appeal.

■ Crucial to a finding that confrontation has not been denied by the admission of the prior testimony of a witness, rather than the witness himself, is a determination that the unavailability of the witness properly has been determined. Where a witness bases his unavailability upon a claim of Fifth Amendment privilege, the trial court must ascertain whether the witness' concern with self-incrimination is legitimate. As stated in *Commonwealth v. Carrera*, 424 Pa. 551, 553–4, 227 A.2d 627, 629 (1967):

When an individual ... is called to testify ... in a judicial proceeding, he or she is not exonerated from answering questions merely upon the declaration that in so doing it would be self-incriminating. It is always for

the court to judge if the silence is justified, and an illusory claim should be rejected.

*See also, Commonwealth v. Allen,* 501 Pa. 525, 462 A.2d 624 (1983); *Commonwealth v. Rolon,* 486 Pa. 573, 406 A.2d 1039 (1979); *Commonwealth v. Rodgers,* 472 Pa. 435, 372 A.2d 771 (1977).

In this case, the record reveals that the witness' claim for immunity was based solely upon the bald assertion that he wished to invoke the privilege. The Commonwealth did not challenge the position nor did it attempt to place upon the record any facts to demonstrate that the evidence intended to be elicited would incriminate this witness. To the contrary, the statement of Steele which was admitted, over objection, reflects that Steele was not involved in any wrong doing in this matter as demonstrated by the following excerpts:

A. Well, once I got into my cell, first of all, I met an inmate by the name of Mr.—I forget his name. He was an officer. But I went into my cell, and I was unpacking my belongings, and this is when Mr. McGrogan came into my cell and he asked me my name, and I told him.

He said, I've heard of you, some things about you.

MR. AWESH: At that point, the Court said: Mr. Steele, talk into the mike.

A. He said, I've heard some things about you. I said, what are you talking about, and then he said I was supposed to have been a hit man or something. Somebody was supposedly allegedly told him that.

Q. Was that what you—excuse me. Is that what he told you, Mr. Steele?

A. Yes. That I was supposed to be a hit man or something like that, and proceeded to tell him—proceeded to tell him that I wasn't, he had me mixed up with somebody else, in which was a man by the name of Gregory Steele.

Q. Were you never [sic] a hit man?

A. Never.

(N.T. 10/9/85, p. 62–63.)

. . . .

A. I was asked to eliminate two ladies.

Q. What does eliminate mean?

A. To kill them, to get rid of them.

Q. Tell us specifically as you can what it was that Mr. McGrogan said to you.

A. He had said that it was two ladies that was testifying against him on the charges of dope. They were allegedly going to tell on him, and he had asked me if I basically was interested in taking the contract, and I proceeded to tell him I don't do things like that, and I'm not about that.

He said, well, I know you are, and just think about it. So I asked him very nastily to leave, and he left, and this is when Mr. Roy Layne entered my cell.

Q. What did you do, Mr. Steele? Did you have anymore contact with the Defendant, Robert McGrogan, after that?

A. Yes. He came back to my cell again.

Q. When?

A. Maybe half an hour later and talked, and I told him very impolitely to leave me alone. I said, leave me alone, man. Because I thought he was trying to set me up or something. And he left, but he proceeded to persist in asking me and keep asking me.

*Id.* at 64.

. . . .

Q. How many times would you say he continued to do that?

A. About five, because I was supposed to leave that Monday. I did come in on Friday. I'm sorry. I was going to leave that Monday to go back to Washington County.

> Q. Did you ever tell him that you were supposed to go back to Washington County?
>
> A. No. After he told me he was serious about this, and I guess I was playing along with him, trying to get all the information I can, because I was going to turn it over to the police. I told him I was leaving Monday to go to the street, and he believed me on that. So he was giving me more information about the ladies inside of the house and to make some phone calls.

*Id.* at 65.

Moreover, the record reflects that Steele was the individual who, in fact, warned the Hoegrels of McGrogan's intention towards them. It is clear that nothing in Mr. Steele's statement suggested his complicity with McGrogan in the crimes charged.[4]

 The instant circumstances are to be distinguished from the case in which a witness has not testified, so that the content of his testimony is unknown. In such an instance it is perfectly reasonable to consider the effect of extrinsic evidence upon the potential witness' fear that his own testimony will be incriminatory. *Commonwealth v. Allen, supra; Commonwealth v. Hawthorne*, 428 Pa. 260, 236 A.2d 519 (1968). Where other evidence tends to implicate the witness in criminal activity, the witness may have justification for invoking his Fifth Amendment privilege to prevent being harmed by his own words.

Where, however, the substance of the witness' testimony is already known to absolve him of any wrongdoing, he cannot support his desire to invoke the privilege by relying upon the fact that other evidence at trial may cast suspicion upon him. By definition, the privilege against self-incrimination prevents an individual from providing evidence which may lead to his own prosecution. *Andresen v. Maryland*,

---

4. The Commonwealth's final argument is that this matter should be remanded for the development of a record establishing the predicate for Steele's claim of the Fifth Amendment privilege, rather than for a new trial. Because of the internal inconsistency of the assertion of the privilege and the content of the prior testimony, this request would be an act of futility.

427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). An individual who wishes to invoke this privilege must have a reasonable basis for believing his testimony will be incriminatory. *Commonwealth v. Allen, supra; Commonwealth v. Rolon, supra; Commonwealth v. Rodgers, supra; Commonwealth v. Carrera, supra.* In the instant case Mr. Steele's insistence that his testimony at trial would run afoul of his Fifth Amendment rights can have but one reasonable basis: that his earlier self-exculpating statement was false, and that the true statement Steele would give at trial would reflect greater involvement on his part. Thus, if we are to accept the Commonwealth's position, we also must assume the unreliability of the preliminary hearing transcript of Steele's testimony, an assumption which would further undermine the fact-finding process conducted at the instant trial. We are content, however, to reject the Commonwealth's argument and to find that Steele's unavailability has not been properly proven. The admission of his preliminary hearing testimony, therefore, was error.[5]

■ Having determined that the trial court indeed erred in admitting the transcript of this witness' former testimony, we now address the Commonwealth's remaining contention that such error was harmless. In this regard, the

5. We also note that the admission of Steele's preliminary hearing testimony violated state evidentiary law governing the admissibility of former testimony, 42 Pa.C.S. § 5917, for the same reasons. That section provides, in pertinent part:

Whenever any person has been examined as a witness, either for the Commonwealth or for the defense, in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross-examine, *if such witness* afterwards ... *becomes incompetent to testify for any legally sufficient reason properly proven,* notes of his examination shall be competent evidence upon a subsequent trial of the same criminal issue. (Emphasis added.)

Act of July 9, 1976, P.L. 586 § 2, 42 Pa.C.S. § 5917.

Because the parties have not raised this issue, however, it is waived and its determination is not necessary to our disposition of this matter.

Commonwealth argued to the Superior Court that the standard pronounced by the United States Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), was relevant to a determination of the instant case. The *Van Arsdall* standard analyzed the relationship between the Confrontation Clause and the harmless error doctrine recognized that a violation of the Confrontation Clause could indeed constitute harmless error. We agree that such a violation could be harmless error in a given factual situation. We disagree that such is the case in the instant matter.

In *Van Arsdall* the United States Supreme Court set forth the following standard for making the determination as to whether the error is harmless:

> [T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to ... harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* at 684, 106 S.Ct. at 1438. The Commonwealth seizes upon the words "these factors include" to justify its position that, in this situation, we should assess whether the error was harmless by using factors other than those set forth in *Van Arsdall*. It argues that the factors established in *Van Arsdall* are inapposite in the instant case because the type of error which occurred in this case is different from the type of error in *Van Arsdall*. This

position is inexplicable in view of the United States Supreme Court's express language:

> [T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, *like other Confrontation Clause errors,* is subject to ... harmless-error analysis. (Emphasis added.)

*Id.* at 684, 106 S.Ct. at 1438.

The instant issue implicates a Confrontation Clause question. Moreover, nowhere in the Commonwealth's brief does it suggest what the "other factors" should be that distinguish the error here raised.

The Commonwealth contends:

> In the instant case the issue does not concern the *reliability* of the testimony admitted but rather relates to the technical evidentiary rules and procedures upon which the testimony was admitted. Clearly these rules and procedures are important and should be complied with. Nevertheless, in examining the impact of error resulting from noncompliance the focus should not be directed toward the indicia of reliability of the witness' testimony but rather toward whether the underlying error itself contributed to respondent's conviction. In regard to the nature of the error, the present case is clearly distinguishable in its facts from those of *Van Arsdall, supra,* and *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In those cases improper testimony concerning matters to be resolved by the fact finder, including facts in issue and credibility of witnesses, was admitted yet found to be harmless. In the instant case the error implicated evidentiary matters that would *not* be submitted to the fact finder for determination. (Emphasis supplied.)

See Appellant's brief at p. 15.

Disingenuously, the Commonwealth would have us create a fictitious distinction between the ruling and the impact of that ruling upon the outcome of the trial. The sophistry of such a position is readily apparent. The thrust of *Van Arsdall*'s test in determining harmless error is to ascertain

the impact of error upon the verdict. Obviously, the impact of the erroneously admitted evidence must be evaluated within the context of the prosecution's entire case when determining its effect upon the ultimate verdict.

This aspect of *Van Arsdall* is in accordance with the harmless error doctrine long established in this Commonwealth. As this Court noted in *Commonwealth v. Story*, 476 Pa. 391, 412–13, 383 A.2d 155 (1978):

> [A]n error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that error could not have contributed to the verdict. (citations omitted). Under this approach, a reviewing court first determines whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt. If 'honest, fair-minded jurors might very well have brought in not guilty verdicts,' an error cannot be harmless on the basis of overwhelming evidence. (Citations omitted.)

*See also, Commonwealth v. Elmore*, 508 Pa. 81, 494 A.2d 1050 (1985); *Commonwealth v. Mehmeti*, 501 Pa. 589, 462 A.2d 657 (1983).

The focus of this approach requires a finding that Mr. Steele's former testimony was a significant factor in the jury's arrival at a guilty verdict. Without the testimony, the Commonwealth's evidence was insufficient as a matter of law to sustain a conviction. Roland Steele was the only witness who could testify as to the crimes with which McGrogan was charged. The inmates who claimed to have heard Steele's conversations with McGrogan contradicted Steele's version of events; thus, without Steele's testimony, there was no evidence to suggest McGrogan's guilt. Under these circumstances, the error cannot be deemed harmless.

Accordingly, the order of the Superior Court is affirmed, and a new trial is ordered.

McDERMOTT, J., files a dissenting opinion.

McDERMOTT, Justice, dissenting.

If, as the majority suggests, the only reason Mr. Steele would not testify is that the truth would inculpate him, the matter should end here and now, as he is the only witness that inculpates the appellee. I would remand the case to determine if that is his position, or whether there are other sufficient reasons that would make him legally privileged.