**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Samuel Elton BROWN (Two Cases).**

Superior Court of Pennsylvania.

Argued April 9, 1997.

Filed Sept. 19, 1997.

Randa B. Clark, Assistant District Attorney, Butler, for Commonwealth, appellant.

Alexander H. Lindsay, Jr., Butler, for appellee.

Before CIRILLO, President Judge Emeritus, JOHNSON, J., and CERCONE, President Judge Emeritus.

CERCONE, President Judge Emeritus.

This is a consolidated interlocutory appeal as of right from two pre-trial orders entered by the Court of Common Pleas of Butler County. *See* Pa. R.A.P., Rule 311(d), 42 Pa.C.S.A. (Commonwealth Appeals in Criminal Cases).[1] We affirm and remand for trial.

The Pennsylvania State Police arrested appellee, Samuel Elton Brown, on January 17, 1996 for participating in the murder of Ada Darlene Lumley. Ms. Lumley was last seen in early January of 1967. On January 21, 1967, the victim's frozen body was discovered in an abandoned strip mine located in Butler County, Pennsylvania. An autopsy revealed that Ms. Lumley died from multiple stab wounds to the neck and back. The victim lived in Grove City, Pennsylvania. Witnesses saw her in the company of appellee and his brother, Donald Leroy Brown, on the evening of January 9, 1967. However, nobody saw Ms. Lumley after January 9th.

Pennsylvania State Police officers questioned appellee and his brother about the Lumley murder on January 21st and 22nd of 1967. The Commonwealth and appellee agree that these interviews constituted "custodial interrogations" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Both Donald and Samuel Brown gave statements to the police. On January 31, 1967, counsel was appointed to represent Samuel Brown.[2] The Commonwealth subsequently charged Donald Brown with homicide, and a jury trial commenced in July of 1967. Appellee testified against his brother at trial. Throughout the trial, appellee was represented by counsel. The jury found Donald Brown guilty of first degree murder and determined that the appropriate penalty was life imprisonment. *See Commonwealth v. Donald Leroy Brown,* Butler County O & T No. 26 March Term, 1967, N.T. July 17–21, 1967 at 546–549.

At some point following this conviction, Donald Brown informed Pennsylvania authorities that Samuel Brown lied at the 1967 trial. The certified record is unclear as to when Donald Brown first accused his brother of complicity in Ms. Lumley's murder. However, the trial court found that Pennsylvania State Police officers interviewed Donald Brown on April 3, 1995 and August 15, 1995 with regard to Samuel Brown's alleged involvement in the Lumley homicide. *See* Suppression Court Opinion filed June 13, 1996 at 2. During these interviews, Donald Brown stated that his brother was present when Ms. Lumley died and that he actively participated in the murder.

As a result of Donald Brown's information, the police began looking for Samuel Brown. In August of 1995, Pennsylvania authorities learned that he could be found in Lake City, Florida. Two Pennsylvania State Police officers, Charles Barger and Raymond Melder, were dispatched to Florida to interview Samuel Brown. Sergeant Art Piccolo of the Columbia County (Florida) Sheriff's Office

---

1. The Commonwealth has certified that the trial court's orders will terminate or substantially handicap the prosecution of this case.

2. The trial court originally appointed Leo Stepanian, Esquire as counsel for Samuel Brown. N.T. 6/3/96 at 8–9. Mr. Stepanian withdrew his appearance and Lee A. Montgomery was substituted as counsel on April 10, 1967. *Id.*

helped the Pennsylvania officers to locate the suspect. Accompanied by Sergeant Piccolo, Troopers Barger and Melder found appellee at the Lake City Moose Lodge on August 29, 1995.

The Pennsylvania officers informed appellee that they were investigating the Lumley murder and requested Mr. Brown to answer some questions. Appellee agreed to talk to the police but stated that he wanted to remain at the Moose Lodge. The officers explained that the interview required a private setting and asked appellee to accompany them to the Columbia County Sheriff's Office.[3] The officers explained that the interview was voluntary and that appellee could end the discussion and leave at any time. The officers did not give appellee *Miranda* warnings and counsel was not present at the August 29th interview. After about thirty minutes, appellee stated that he no longer wanted to talk to the police. The officers ended the interview and provided appellee with transportation back to the Moose Lodge.

The Pennsylvania State Police officers returned to Lake City on January 17, 1996 with an arrest warrant for Samuel Brown charging him with the murder of Ada Darlene Lumley. Florida authorities arrested appellee, transported him to the Columbia County Sheriff's Department, and advised him of his *Miranda* rights. The Pennsylvania troopers questioned appellee concerning the Lumley murder at the Columbia County Sheriff's Office. Authorities thereafter transported appellee to Pennsylvania where he was confined in the Butler County Prison. Appellee contacted Troopers Barger and Melder and requested a meeting at the Butler County Prison. The troopers went to the prison and spoke with appellee on January 26, 1996.

The trial court entered an order on January 30, 1996 appointing Alexander H. Lindsay, Jr., Esquire to represent appellee. In March of 1996, Mr. Lindsay filed an omnibus pre-trial motion on appellee's behalf. The Honorable Martin J. O'Brien, President Judge of Butler County, conducted a hearing on the motion on June 3, 1996. The Commonwealth presented the testimony of four witnesses: Chris Williams (the Second Deputy Clerk of Courts for Butler County), Pennsylvania State Troopers Barger and Melder, and Sergeant Piccolo. The defense did not call any witnesses and did not present evidence. On June 13, 1996, President Judge O'Brien ruled as follows: (1) the court suppressed the statements appellee gave to the police on January 21 and 22 of 1967; (2) the court found appellee's motion to suppress testimony from Donald Brown's preliminary hearing to be moot;[4] (3) the court denied suppression for appellee's testimony at his brother's trial; (4) the court granted suppression as to appellee's statement of August 29, 1995 without prejudice to the Commonwealth's right to seek review if any additional evidence becomes available demonstrating that the August 29th statement was not derived from appellee's suppressed statements of January 21 and 22, 1967; (5) the court granted suppression for the January 17, 1996 statement, without prejudice to the Commonwealth's right to seek further review if additional evidence becomes available to show that the January 17th statement was not derived from the suppressed statements of January 21 and 22, 1967; and (6) the court denied suppression for appellee's statement of January 26, 1996.

On June 17, 1996, the Commonwealth petitioned for an evidentiary hearing prior to trial so that the prosecution could present evidence on the suppression rulings concerning appellee's statements of August 29, 1995 and January 17, 1996. President Judge O'Brien heard argument that same day on the Commonwealth's request. However, the court declined to conduct a full evidentiary hearing before trial with regard to the Commonwealth's substantive claims. Immediately thereafter, the Commonwealth filed the instant appeal which presents four issues for

---

3. Sergeant Piccolo testified at the suppression hearing that he is a member of the Lake City Moose Lodge and that it does not contain any private meeting rooms that could have been used for the police interview. N.T. 6/3/96 at 75.

4. The suppression court opinion indicates that the notes of testimony from the preliminary hearing cannot be located and therefore are unavailable for use against appellee. *See* Suppression Court Opinion at 7.

our consideration: did President Judge O'Brien err in granting suppression as to: (1) appellee's statements of January 21 and 22, 1967, (2) the statement of August 29, 1995, and (3) the statement of January 17, 1996? The Commonwealth also contends that the trial judge erred in denying its request for a second pre-trial evidentiary hearing regarding appellee's statements of August 29, 1995 and January 17, 1996.

 Without question, it is the province of the suppression court to make findings of fact and conclusions of law as to whether evidence was obtained in violation of an accused's constitutional rights. *Commonwealth v. Tuck,* 322 Pa.Super. 328, 332, 469 A.2d 644, 646 (1983). The standard of review that governs a ruling on a motion to suppress is well-settled. An appellate court must first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom. *Commonwealth v. Oglialoro,* 377 Pa.Super. 317, 318, 547 A.2d 387, 387 (1988), *aff'd,* 525 Pa. 250, 579 A.2d 1288 (1990). "[When] the Commonwealth appeals from the ruling of a suppression court, 'we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.' " *Commonwealth v. Romine,* 453 Pa.Super. 42, 47, 682 A.2d 1296, 1298 (1996) (*en banc*), *appeal denied,* 547 Pa. 754, 692 A.2d 565 (1997) (quoting *Commonwealth v. DeWitt,* 530 Pa. 299, 302, 608 A.2d 1030, 1031 (1992)). If the suppression court's factual findings are supported by the certified record, we are bound by those findings. *Id.* However, factual findings wholly lacking in evidence may be rejected. *Commonwealth v. Bennett,* 412 Pa.Super. 603, 606, 604 A.2d 276, 277 (1992). We may also reverse if the legal conclusions drawn from the suppression court's factual findings are in error. *Romine, supra.*

Appellant first contends the suppression court erred in determining that the Commonwealth failed to prove that appellee was advised of his *Miranda* rights prior to the custodial interrogation of January 21 and 22, 1967. We note initially that President Judge

O'Brien was correct in applying *Miranda* to this case. In *Commonwealth v. Ware,* 446 Pa. 52, 55–56, 284 A.2d 700, 702 (1971), the Pennsylvania Supreme Court explained that pursuant to *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), all statements given to police during a custodial interrogation must be evaluated under the *Miranda* standard if the trial of the defendant began after June 13, 1966, the date of the *Miranda* decision. In this case, appellee's custodial interrogation itself occurred after the effective date of *Miranda* and his trial has not yet commenced. Thus, there is no question that *Miranda* applies.

 An individual held for interrogation must be clearly informed as to four specific points: (1) that he has the right to remain silent; (2) that anything he says can be used against him in a court of law; (3) that he has the right to consult with a lawyer; and (4) that counsel will be appointed if he cannot afford a lawyer. *Miranda,* 384 U.S. at 471–72, 86 S.Ct. at 1626–27, 16 L.Ed.2d at 722. A warning covering all four of these points is an "absolute prerequisite to interrogation." *Id.* No amount of circumstantial evidence that a person may have been aware of these rights suffices as a substitute for full and explicit information prior to interrogation. *Id.*

> Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.... A statement we made in *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70, 77 (1962) is applicable here:
>
> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

*Id.,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. The United States Supreme Court explicitly held that it is the responsibility of the prosecution to show that the au-

thorities explained to the defendant the full panoply of the *specific rights* protected under *Miranda* before any interrogation commenced. *Id.,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. Unless or until the state unequivocally demonstrates that *all* of the *Miranda* warnings were provided, no evidence obtained as a result of interrogation can be used against the defendant. *Id.*

The Pennsylvania Supreme Court has explained the impact of *Miranda* in the following manner:

It is axiomatic that a confession to be valid must be given free of any physical or psychological coercion which might interfere with one's will to resist. Further, where the custodial interrogation involves the waiver of constitutional rights guaranteed under the Fifth and Sixth Amendments, *the record must clearly demonstrate* that the accused was fully apprised of his rights and knowingly made the decision to waive them.

*Commonwealth v. Cunningham,* 471 Pa. 577, 582–83, 370 A.2d 1172, 1175 (1977) (citations omitted; emphasis added). *See* Pa.R.Crim. P., Rule 323(h), 42 Pa.C.S.A. (the Commonwealth has the burden of establishing that challenged evidence was not obtained in violation of the defendant's rights).

In this case, the Commonwealth did not call the officers who interviewed Samuel Brown in 1967 to testify at the suppression hearing. Instead, the prosecution introduced the transcript from Donald Brown's trial in an attempt to demonstrate that appellee was apprised of his *Miranda* rights prior to the custodial interrogations that occurred in January of 1967.

Q. [By defense counsel for Donald Brown]: Now, let me get down to the police station. Were you mugged and fingerprinted when you were brought in?

A. [By Samuel Elton Brown]: Yes.

Q. Did you know Ada Lumley was dead when you were arrested? Did they tell you she was dead?

A. I'm not sure if they told me right away or not.

Q. Did you think you were being questioned as to her death?

A. Yes.

Q. At the police station.

A. I'm not quite sure.

THE COURT: Not the police station, you mean at the barracks?

[Defense Counsel for Donald Brown]: Yes, sir.

A. I was brought there first.

Q. Were you informed of your constitution rights at that time?

A. Yes.

THE COURT: I didn't hear you?

THE WITNESS: yes.

Q. Did they offer to get you an attorney?

A. They told me that one would be provided if I couldn't afford one.

Q. And you didn't ask for one?

A. I don't remember.

N.T. 7/17–21/67 at 284–85.

The Commonwealth also cites to the testimony of Corporal William A. Molczan of the Pennsylvania State Police from Donald Brown's trial. Corporal Molczan stated that during the January 1967 interrogations, Samuel Brown admitted he had stolen three automobiles and a hi-fi amplifier. *Id.* at 443. In an attempt to discredit Samuel Brown's testimony, defense counsel for Donald Brown extensively questioned Corporal Molczan about the fact that Samuel was never charged with these thefts. *Id.* at 443–451. On cross-examination, the prosecutor examined the issue of whether Samuel Brown was apprised of his "constitutional rights" prior to the 1967 interrogations:

Q. [By the Prosecutor]: Officer Molczan, in regard to the statement made about these cars, which Sam made to you, on this particular issue as to what [he] divulged concerning these cars, had you specifically advised him of his constitutional rights to keep his mouth shut about them, about the right to have an attorney if he wanted one on this aspect and anything he said could be used against him?

A. Sam Brown was advised of his rights, his constitutional rights by myself and

others at the beginning of this investigation, in regard to the Lumley investigation. I do not recall advising him of any rights in regard to the theft of the automobile, which was drawn out of him later.

Q. Well, then, with no other evidence and the fact the man stated he did this, and in a situation where you hadn't advised specifically his rights on this point, you advised him generally on the Lumley case, would you feel that this was competent evidence to make an information or file a criminal prosecution as the law is today?

A. No, sir.

*Id.* at 451–52. Corporal Molczan's testimony continued, establishing that he did not know the towns from which the automobiles and the amplifier were stolen, whether the Pennsylvania State Police had jurisdiction over the thefts, or whether the New Castle City Police Department had jurisdiction. *Id.* at 452–53. On redirect, Samuel Brown testified as follows:

Q. [By the prosecutor]: At the time you were at the State Police Barracks and you told the police the sequence of events of things that happened as you told this jury, right after you told the police, at this time or before, had you requested your minister to come down to see you?

A. Yes, sir.

Q. And was he in fact called down to the barracks?

A. Yes, sir.

Q. Were you given an opportunity to talk to him alone?

A. Yes, sir.

Q. Did you discuss with him what you had told the police?

A. Yes, sir.

Q. What was the minister's name?

A. George Morton.

Q. And what night was it that he was there?

A. Sunday evening.

Q. That would be January 22?

A. January 22, Sunday evening[.]

[Q.] [A]nd what church is he a pastor of?

A. Calvary Orthodox Church in Harrisville.

Q. Is this the church that your mother and father belong to?

A. Yes, sir.

Q. Newly formed church?

A. Yes, sir.

Q. Two congregations going together?

A. Yes, sir.

Q. Did you have confidence in this minister?

A. Yes, sir.

Q. And did he tell you to tell the truth?

A. Yes, sir.

Q. Did you tell the truth?

A. Yes, sir.

Q. Did you have the opportunity to ask for a lawyer if you wanted one?

THE COURT: I didn't hear you.

Q. Did you have an opportunity to have a lawyer if you wanted one at that time?

A. Yes.

Q. You asked for the preacher?

A. Yes, sir.

*Id.* at 471–72. Later during redirect, Samuel Brown responded as follows to the prosecutor's questions with regard to the circumstances surrounding the 1967 interrogations:

Q. Sam, with regard to what you believed, you did call for your minister rather than anyone else at that time, is that correct?

A. Yes, sir.

Q. Did you call for your mother and dad?

A. Not at first, no.

Q. You called the preacher before you called them?

A. Yes, sir.

Q. How many times did you go to church prior to that?

A. To this minister, he was our preacher.

Q. How many times did you go to church?

A. Up to this point, I missed just a couple of Sundays. I had gone regularly.

Q. You called him before you had called your folks?

A. Yes.

Q. And was that your own idea, you asked the State Police or did they ask you if you needed a minister?

A. That was my own idea.

Q. They called him for you as I understand?

A. Yes, sir.

Q. But you didn't have an attorney until I suggested you have one appointed by a court, is that right?

A. Yes. I understood there would be one appointed for me because I wasn't able to afford one myself.

Q. Well, didn't the State Police tell you you can have a lawyer?

A. That's what they said, yes.

Q. They didn't tell you that you didn't need an attorney?

A. They said if I wasn't able to get one, that one would be provided for me.

*Id.* at 478–79.

The testimony from Donald Brown's trial clearly and unequivocally indicates that Samuel Brown was apprised at the State Police barracks that he had the right to consult an attorney and that counsel would be provided if he requested an attorney. The testimony of Corporal Molczan strongly implies that, with regard to the Lumley murder investigation, Samuel Brown was informed of his right to remain silent and that anything he said could be used against him. However, Corporal Molczan spoke generally of giving appellee his "constitutional rights" rather than specifically delineating which of those rights were covered with appellee. Furthermore, the testimony reproduced above does not speak at all to the question of exactly *when* appellee was informed of his constitutional rights with regard to the Lumley murder investigation.

■ We also note our agreement with appellee that Corporal Molczan's testimony from Donald Brown's trial constitutes inadmissible hearsay on the question of whether appellee received his *Miranda* rights in 1967. Our law provides that when a witness is "unavailable," his or her prior recorded testimony from a previous proceeding may be introduced provided the defendant had counsel and a full and fair opportunity to cross-examine the witness during the earlier proceeding. *Commonwealth v. McGrogan,* 367 Pa.Super. 394, 400, 532 A.2d 1203, 1206 (1987), *aff'd,* 523 Pa. 614, 568 A.2d 924 (1990). *Accord Commonwealth v. Presbury,* 445 Pa.Super. 362, 665 A.2d 825 (1995), *appeal denied,* 544 Pa. 627, 675 A.2d 1246 (1996). In order for prior recorded testimony to be admitted, however, four specific requirements must be satisfied: (1) the witness must be "unavailable" as that term is defined by Pennsylvania law; (2) the testimony sought to be introduced must have been taken at a criminal proceeding in or before a court of record; (3) the defendant must have been present at the time the former testimony was taken and must have received an opportunity to examine or cross-examine the witness; and (4) the trial at which the former testimony is sought to be introduced must involve the same "criminal issue." *Commonwealth v. Galloway,* 476 Pa. 332, 336–37, 382 A.2d 1196, 1198 (1978). Our law is clear that prior recorded testimony cannot be admitted at a subsequent proceeding if the defendant in the later proceeding had no opportunity to fully cross-examine the witness on the earlier occasion. *Commonwealth v. Smith,* 436 Pa.Super. 277, 288, 647 A.2d 907, 912 (1994).

■ The first problem in this case is that the certified record does not indicate why Corporal Molczan was not called to testify against appellee at the suppression hearing conducted June 3, 1996. *See* N.T. 6/3/96 at 3–41. Thus, we have absolutely no basis for concluding that he was an "unavailable witness." It may be that Corporal Molczan is deceased or in such ill health that he cannot be summoned to testify against appellee, or even that he no longer remembers the details of an interrogation that took place thirty years ago. However, courts are not entitled to simply presume that a witness is "unavailable"; such a conclusion must stem from evidence that proves the witness is actually "unavailable" and cannot testify at a second proceeding. *See Commonwealth v. McGrogan,* 523 Pa. at 621–25, 568 A.2d at 928–29.

The second difficulty with considering Corporal Molczan's prior recorded testimony in the present case is that appellee was not the accused at the proceeding at which the witness testified. His brother, Donald Brown, was the defendant. Although appellee was represented by counsel during his brother's trial, Samuel Brown's attorney was not given the opportunity to cross-examine Corporal Molczan concerning the administration of *Miranda* rights or anything else. We note that present counsel properly objected to the hearsay nature of Corporal Molczan's previously recorded testimony at appellee's suppression hearing. N.T. 6/3/96 at 21.

■ In light of all the circumstances surrounding the present appeal, President Judge O'Brien concluded that the testimony from Donald Brown's trial was insufficient to satisfy the Commonwealth's heavy burden of proving that appellee received all four of his *Miranda* rights prior to the inception of the custodial interviews conducted in January of 1967. We agree with the suppression court's conclusion. Therefore we decline to grant relief to the Commonwealth with regard to this issue.

Appellant next contends that President Judge O'Brien erred in suppressing the statements appellee made on August 29, 1995 and January 17, 1996 at the Columbia County Sheriff's Office. The Commonwealth argues that these statements to the police should be deemed acceptable because they stem from appellee's testimony at Donald Brown's trial, which the suppression court found admissible. In this context, the Commonwealth also contends that because President Judge O'Brien found the trial testimony admissible, that must mean the statements of January 1967 have been "purged of their primary taint" so that all evidence against appellee must be considered unobjectionable even if it derived from the 1967 statements.

■ The concept of "fruit of the poisonous tree" and the possibility of "purging the taint" of contaminated evidence were extensively discussed in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Pennsylvania Supreme Court found the following language from *Wong Sun* to be particularly instructive:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

*Cunningham*, 471 Pa. at 585–86, 370 A.2d at 1176–77 (quoting *Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. at 417 (footnote and citations omitted)). If the discovery of evidence can be traced to a source independent of the initial illegality, suppression is not mandated. *Commonwealth v. Ariondo*, 397 Pa.Super. 364, 377, 580 A.2d 341, 347 (1990), *appeal denied*, 527 Pa. 628, 592 A.2d 1296 (1991). The "fruit of the poisonous tree" doctrine excludes evidence obtained from, or acquired as a consequence of, lawless official acts; it does not exclude evidence obtained from an "independent source." *Id.*

■ In this case, it is true that President Judge O'Brien held that appellee's *trial testimony* from July of 1967 was purged of any taint deriving from the statements he gave in January, 1967 because of the intervention of the attorney appointed to represent appellee during his brother's trial.[5] However, counsel was not appointed until January 31, 1967. Thus, the fact that President Judge O'Brien concluded appellee's counselled trial testimony cannot be deemed "fruit of the poisonous tree" does not mean that statements appellee

---

5. *See Commonwealth v. Lowenberg*, 481 Pa. 244, 392 A.2d 1274 (1978) (although initial interrogation was coercive in the absence of an effective *Miranda* waiver, statements made six days later after the defendant consulted with an attorney were purged of any taint of the original illegality); *Commonwealth v. Cunningham*, *supra* (a counselled interrogation preceded by an ade-

quate opportunity to confer with counsel is the kind of attenuating circumstance that dissipates a prior illegality); *Commonwealth v. Leveille*, 289 Pa.Super. 248, 433 A.2d 50 (1981) (prior illegality was purged as to subsequent confession because defendant was afforded the opportunity to confer with counsel prior to the interrogation that yielded the confession).

made prior to the appointment of counsel have suddenly become free of taint. We see no logical basis for holding that evidence derived from the uncounselled statements made prior to the appointment of Mr. Stepanian must be considered admissible in this case. Furthermore, we find it significant that appellant has provided us with no citations to statutory or case law that would support such a claim.

As previously stated, if evidence can be traced to a source independent of any prior illegality, suppression is not required. *Ariondo, supra.* The burden rests on the Commonwealth to demonstrate that the secondary evidence was gathered by means sufficiently distinguishable from any illegality so as to be "purged of its primary taint" rather than deriving from exploitation of the illegality. *Commonwealth v. Brooks,* 468 Pa. 547, 558–59, 364 A.2d 652, 657 (1976). In this case, President Judge O'Brien determined that the testimony of Troopers Barger and Melder indicated they relied heavily on appellee's uncounselled statements from January of 1967 when conducting their investigation in 1995. We have reviewed the Troopers' testimony as set forth in the hearing transcript from June 3, 1996 and we conclude that it supports President Judge O'Brien's factual findings. *See* N.T. 6/3/96 at 51 (testimony of Charles A. Barger) and at 86–87, 95–99 (testimony of Raymond J. Melder). Because of the nature of the testimony provided by Troopers Barger and Melder, the suppression court found it impossible to determine whether appellee's 1995 and 1996 statements derived from the uncounselled statements appellee made in January of 1967, from his counselled trial testimony, or from both. *See* Suppression Court Opinion at 12–13 and 13–14. President Judge O'Brien therefore held that the Commonwealth had not met its burden of proving that the primary taint attached to appellee's 1967 statements was purged with regard to his August, 1995 and January, 1996 statements. Upon careful review of the certified record, we find no grounds on which we could overturn President Judge O'Brien's ruling on the admissibility of the statements appellee made to the Pennsylvania State troopers on August 29, 1995 and January 17, 1996.

The Commonwealth's final contention is that the trial judge, the Honorable Thomas J. Doerr, erred in denying its motion for a second suppression hearing prior to appellee's trial. The prosecutor requested the second pre-trial hearing to supplement the evidence presented to President Judge O'Brien on June 3, 1996 concerning the question of whether appellee's statements of August 29, 1995 and January 17, 1996 were "fruit of the poisonous tree." On June 17, 1996, the day scheduled for jury selection in appellee's case, Judge Doerr convened a hearing to address the Commonwealth's request for a second pre-trial evidentiary hearing. Defense counsel objected to the prosecution motion on the grounds that Rule of Criminal Procedure 323 places the burden on the Commonwealth to demonstrate that evidence challenged in a suppression motion was not obtained in violation of the defendant's rights. *See* Pa.R.Crim.P., Rule 323(h), 42 Pa.C.S.A. Judge Doerr afforded the Commonwealth the opportunity to explain precisely why a second evidentiary hearing was necessary. N.T. 6/17/96 at 9.

The prosecutor stated that the Commonwealth considered the order and opinion President Judge O'Brien filed on June 13, 1996 to be "ambiguous." The Assistant District Attorney premised this claim on President Judge O'Brien's statement that the suppression court was unable to determine, on the basis of evidence presented at the June 3rd hearing, the extent to which the State Police officers relied on the inadmissible January 1967 statements when questioning appellee in August of 1995 and January of 1996. *Id.* at 10–12 (discussing Suppression Court Opinion at 10–14). Defense counsel responded that pursuant to Rule 323(h), *supra,* the fault must be laid at the Commonwealth's door if President Judge O'Brien lacked full and sufficient information to conclusively determine the extent to which the State Police relied on tainted evidence. *Id.* at 13. The Commonwealth did not offer any explanation as to the nature of the supplementary evidence it was prepared to introduce. Nor did the prosecutor ask the court for an opportu-

nity to make an offer of proof. Judge Doerr then stated that based on the provisions of Rule 323 and the content of the argument presented, he saw no need for a second suppression hearing and denied the Commonwealth's motion. *Id.* at 15.

 The Superior Court reviews the trial court's resolution of a pre-trial motion under the standard applicable to the particular issue or issues raised in that motion. *Commonwealth v. Surina,* 438 Pa.Super. 333, 337, 652 A.2d 400, 402 (1995). The question of whether the trial court has properly responded to a Commonwealth request to admit evidence is evaluated under an abuse of discretion standard. *Id.* at 338, 652 A.2d at 402. *See Commonwealth v. Hill,* 542 Pa. 291, 305, 666 A.2d 642, 649 (1995), *cert. denied,* — U.S. —, 116 S.Ct. 1880, 135 L.Ed.2d 175 (1996) (an appellate court may only reverse a trial court's ruling on an evidentiary issue if the trial judge committed an abuse of discretion). We have carefully reviewed President Judge O'Brien's opinion and order of June 13, 1996 as well as the transcripts from the pre-trial hearings conducted on the 3rd and 17th of June, 1996. We note that the Commonwealth has never explained the nature of the evidence it was precluded from presenting at the June 17th hearing or the bearing this evidence would have on President Judge O'Brien's suppression ruling. The prosecutor did not provide this information to Judge Doerr nor has she discussed it in the appellate brief filed with this court.

 We have already extensively discussed the nature of President Judge O'Brien's suppression ruling as it concerns the statements appellee made in August of 1995 and January of 1996. We do not find the suppression court's opinion and order to be at all "ambiguous." The suppression court ruled that the Commonwealth failed to meet its burden of proof in demonstrating that Troopers Barger and Melder did not rely upon the constitutionally infirm statements from January 1967 when questioning appellee in August of 1995 and January of 1996. The fact that President Judge O'Brien generously stated that his rulings were "without prejudice" to the Commonwealth's

right to present additional evidence to the trial judge does not relieve the prosecution from its duty to make an offer of proof in support of its motion. Under the circumstances of this case, and particularly in light of the fact that the Commonwealth has not explained the content of the additional evidence it was prevented from presenting, we are unable to conclude that Judge Doerr committed an abuse of discretion in declining to conduct a second pre-trial evidentiary hearing on the suppression claim.

Orders affirmed; case remanded for trial.

CIRILLO, President Judge Emeritus, files a dissenting opinion.

CIRILLO, President Judge Emeritus, dissenting.

Because the Commonwealth has offered sufficient evidence to demonstrate that Samuel Brown's statements made to the police in December of 1995 and in January of 1996 are not fruits of the poisonous tree, I conclude that they are admissible at trial. I must, therefore, respectfully dissent.

At the outset I wholeheartedly agree with the majority's finding that Samuel Brown's statements made during the interviews that took place in January of 1967 were correctly suppressed due to the Commonwealth's failure to prove that Brown was properly *Mirandized.* I cannot agree, however, with the majority's logic concerning the suppression of Brown's subsequent statements in 1995 and 1996. In my view, the majority incorrectly concludes that these subsequent statements, given approximately thirty years after the initial statements, were garnered as a direct and substantial result of the initial illegally obtained 1967 statements and thus "fruit of the poisonous tree."

As the majority ably explains, evidence is "fruit of the poisonous tree" and thus subject to suppression if the evidence comes to light by way of exploitation of the illegality. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Commonwealth v. Cunningham,* 471 Pa. 577, 370 A.2d 1172 (1977). Where, however, the evidence is ferreted out by "means sufficiently distinguishable" from the illegality, it is said to be

"purged of the primary taint" and, thus, admissible. *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417. *See Commonwealth v. Ariondo,* 397 Pa.Super. 364, 377, 580 A.2d 341, 347 (1990)(the fruit of the poisonous tree doctrine excludes evidence obtained from, or acquired as a consequence of, lawless official acts; it does not exclude evidence obtained from an independent source).

In the context of a series of statements elicited by the police, our supreme court has held that when a subsequent statement is an act of free will, it is sufficient in itself to sever the causal connection between an initial illegally obtained statement and the subsequent statement. *See Commonwealth v. Chacko,* 500 Pa. 571, 580–82, 459 A.2d 311, 315–17 (1983); *Commonwealth v. Diggs,* 351 Pa.Super. 444, 506 A.2d 431 (1986). *See also Commonwealth v. Hubble,* 509 Pa. 497, 504 A.2d 168 (1986) (where initial illegal statement did not contain inculpatory information, subsequent statements containing defendant's confession were not the product of exploitation of the earlier illegality). The rationale behind the "subsequent taint rule," was explained by the United States Supreme Court in *Oregon v. Elstad:*

> No further purpose would be served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.

470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985).

In the present case the suppression court found that Brown's 1995 statement was voluntarily elicited in a non-custodial setting. The suppression court further found that Brown's 1996 statement was made after Brown knowingly and intelligently waived his *Miranda* rights. Thus, according to the suppression court's findings, which the majority completely sanctions, both statements were voluntarily made. Because these statements were voluntarily made, and because the 1967 statement contained no inculpatory information, and thus was not coercive, the causal connection between the initial 1967 statement and the subsequent voluntary statements has been sufficiently severed.[1] *Chacko, supra; Oregon, supra.*

Even if the voluntariness of the subsequent statements alone were not sufficient to purge the taint of the illegally obtained 1967 statements, the record is replete with a virtual cornucopia of facts that support the conclusion that the 1995 and 1996 statements were not fruit of the poisonous 1967 statement. First, the 1995 and 1996 statements were made approximately thirty years after the illegally obtained statement. *See Diggs,* 351 Pa.Super. at 454, 506 A.2d at 437 (lapse of time between legally and illegally obtained statements is an important factor when determining whether taint is purged). Second, the entire impetus for the 1995 and 1996 statements was that Samuel Brown's brother, who is presently serving a life sentence for the murder of Ada Lumley, contacted authorities and informed them that his brother, Samuel, was present and during and aided in the commission of the murder. *See Wong Sun, supra.* Finally and perhaps most importantly, Samuel Brown testified during his brother's trial to the exact events that were contained in his 1967 illegally obtained statement. By repeating practically verbatim everything contained in the 1967 statement during his brother's trial, Samuel in essence gave a voluntary statement (the trial testimony) that purged the taint of the 1967 interview. *See Wong Sun, supra; Cunningham, supra; Chacko, supra.*

It is beyond comprehension, therefore, to conclude that the 1995 and 1996 statements should be suppressed as fruits of the poisonous tree. The taint of the 1967 statement has been purged not once, but a multitude of times. Accordingly, I would reverse the suppression court's ruling and find that the 1995 and 1996 statements are admissible during Samuel Brown's trial.

---

1. Indeed if the 1967 statement had been inculpatory, then Samuel Brown would have been charged in 1967 with his brother in connection of the murder of Ada Lumley.